# In the United States Court of Federal Claims

No. 16-932

(Filed:  17 July 2024)

*******************************************

| | |
|---|---|
| SPECTRE CORPORATION, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

*******************************************

*James W. Wiggin III*, of Columbus, OH, for plaintiff.

*Andrew J. Hunter*, Trial Attorney, Commercial Litigation Branch, Civil Division, of the US Department of Justice, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Assistant Director, and *Martin F. Hockey*, all of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiff Spectre Corporation manufactures and sells pressure sensors to be used in various industries, including automotive, oil and gas, aviation, and aerospace.  Spectre executed two contracts with NASA to license and commercialize NASA's patented silicon carbide pressure sensor technology.  Plaintiff alleges NASA breached both contracts and the implied covenants of good faith and fair dealing and seeks compensatory damages and lost profits.  The government filed a motion for partial summary judgment on plaintiff's lost profits claims and concurrently filed motions in limine to exclude plaintiff's expert reports and testimony.  In 2022, the Court granted the government's Motions in Limine and excluded some portions of plaintiff's expert evidence on hearsay grounds and other portions as being based on lay person testimony. The Court, however, provided a grace period for plaintiff to serve updated expert reports and for the government to amend its Motion for Partial Summary Judgment.  Plaintiff failed to provide these updated reports by the grace period deadline.  Following weeks of follow-up requests from the government, plaintiffs filed a motion for extension of time.  The Court construed plaintiff's request as a motion for leave to file out of time and denied the Motion on account of both excessive delay and undue prejudice to the government.  The government subsequently filed an amended motion for partial summary judgment.  The government's motion contends plaintiff's failure to provide updated expert evidence leaves its lost profits claim without any evidentiary support.  For the foregoing reasons, the Court grants the government's Amended Motion for

Partial Summary Judgment and dismisses plaintiff's request for any lost profits damages, as pled in counts III and IV.

## I.   Procedural History

On 26 July 2022, the Court granted the government's Motion in Limine to exclude plaintiff's fact report on packaging costs information, portions of the expert report on fabrication cost information, and portions of the fact report on sales projections.[1]  *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 505 (2022).  The Court granted plaintiff an opportunity to "prepare and submit a revised report" for each of the three reports based on "admissible evidence."  *Id.*  On 26 August 2022, the Court adopted a schedule proposed by the parties, setting 31 October 2022 as the deadline for plaintiff to provide the government "with any additional disclosures permitted by the Court's [26 July 2022 Opinion and Order] . . . to include at a minimum" the updated expert report.  26 Aug. 2022 Order at 1, ECF No. 135.  Plaintiff failed to serve any disclosures on the government by the deadline.  Def.'s Opp'n to Spectre's Out of Time Mot. for an Enlargement of Time ("Gov't's EOT Resp.") at 2, ECF No. 137.  Despite the government's prompting via email and several subsequent promises of prompt submission, plaintiff never submitted the updated disclosures.  *Spectre Corp. v. United States*, 165 Fed. Cl. 563, 567 (2023).  Instead, on 30 November 2022—one month after plaintiff's deadline—plaintiff filed a motion for enlargement of time, ECF No. 136.  Following the government's Response, ECF No. 137, plaintiff filed a reply, ECF No. 138, indicating:  "The Government is correct; counsel for Spectre Corporation has no viable excuse for the delay, only inadequate explanations."  Pl.'s Reply at 1.  The Court held telephonic oral argument on the Motion for Enlargement of Time.  *See* Order, ECF No. 139.

The Court denied plaintiff's motion for enlargement of time, concluding:

> Weighing the *Pioneer* factors and the parties' arguments, the Court finds the delay would prejudice the government, the length of the delay impedes efficient court administration, the reason for delay was within plaintiff's reasonable control, and plaintiff did not act in good faith.  [*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).]  "Ultimately, the Court places significant weight on the fact that [plaintiff] has been unable to justify—or even adequately explain—[p]laintiff's repeated delays in this case."  *Wood v. United States*, No. 16-1383, 2022 WL 1422573, at *5 (Fed. Cl. May 5, 2022) (citing *Moczek v. Sec'y of Health & Hum. Servs.*, 776 F. App'x 671, 674 (Fed. Cir. 2019)), *appeal dismissed*,

---

[1] To support its claims for lost profits, plaintiff submitted a lost profits model which purports to estimate the profits Spectre would have enjoyed if NASA had fully performed its contractual obligations.  *See* Def.'s Mot. in Limine to Exclude Portions of Jack Keller's and Nicholas Carollo's Testimony App. at 1–11 (Pl.'s Second Interrogs. Answers), ECF No. 114-1.  The lost profits model comprises thirteen sheets, including a summary, projected gross sales, net lost profits, actual financial performance, projected lost profits by year, a costing matrix, and extended pricing predictions.  *Id.* at 4–7 (Pl.'s Second Interrogs. Answers).  None of these pages were submitted with the parties' briefing, but the government submitted a summary of the sales projections and a net profit comparison.  *Id.* at 129 (Spectre SiC Sales Projections); *id.* at 130 (Net Profit Comparison).  The lost profits calculations rely in part on three sources: (1) cost information provided by Spectre's engineer and project manager Mr. Votypka; (2) cost information provided by plaintiff's expert Dr. Spangler; and (3) sales projections provided by Spectre's CEO Mr. Keller and salesman Mr. Carollo.

No. 2022-1947, 2022 WL 5434205 (Fed. Cir. Oct. 7, 2022).  Plaintiff's failure to meet the 31 October 2022 deadline accordingly does not amount to excusable neglect, so a motion for enlargement of time cannot cure plaintiff's failure.  *See* RCFC 6(b)(1)(B); Tr. at 25:14–16 ("[PLAINTIFF]: . . . I failed to comply with it. When you come right down to it, there is nothing that could be considered to be excusable neglect."); *Pioneer*, 507 U.S. at 395.

*Spectre*, 165 Fed. Cl. at 575.  As a result, plaintiff now has little evidence to replace the excluded fact report on packaging costs information, portions of the expert report on fabrication cost information, and portions of the fact report on sales projections.  The Court summarized its Exclusion Order as follows:

> In sum, portions of Mr. Keller's and Mr. Carollo's testimony predicting future sales of silicon carbide sensors with no connection to their historical sales are not rationally based on their perception and are inadmissible under FRE 701(a).  *See Von der Ruhr*, 570 F.3d at 863–66.  Sales projections relying on Mr. Keller's or Mr. Carollo's assumptions regarding theoretically suitable applications are not based on personalized knowledge, and are likely based on technical, scientific, or specialized knowledge within the scope of FRE 702, and therefore inadmissible under FRE 701(c).  *See Mississippi Chem. Corp.*, 287 F.3d at 373.  Sales projections relying on out-of-court statements by nonlitigants regarding potential purchases of silicon carbide sensors are based on hearsay and are inadmissible under FRE 802.  *See* FRE 801(c).

*Spectre Corp. v. United States*, 160 Fed. Cl. at 503.  At oral argument, plaintiff agreed to the following effect of the Exclusion Order but also expressed some confusion as to the Order's effect:

> [THE COURT:]  [I]n the July 2022 order, the Court . . . grant[ed] in part and den[ied] in part the Government's motions in limine and den[ied] plaintiff's motions in limine.  I wanted to confirm the list of evidence items that are in and out.  So the inadmissible now is Mr. Votypka's testimony on packaging costs, Dr. Melkonian's cost estimates—and both of those are in full—and then Dr. Spangler's report and testimony where he was relying on Dr. Melkonian's materials; some of Mr. Keller and Mr. Carollo's sales projections that were sales projections based on communications with plaintiff's customers, those based on scientific, technical and specialized knowledge, and those based on theoretical sales.  Is that a fair summary of what was not in, Mr. Wiggin?  [PLAINTIFF:]  That was my understanding, although . . . I guess I didn't realize that I can still bring in Mr. Carollo and Mr. Keller as long as the projected sales they were talking about did not involve technical information on their own.

21 Mar. 2024 Oral Arg. Tr. ("Tr.") at 23:3–24:7, ECF No. 152.

Following the Court's order granting the government's Motions in Limine, the government filed an amended motion for partial summary judgment on lost profits on 20 June

2023.  Am. Mot. for Partial Summ. J. ("Gov't's Am. MPSJ"), ECF No. 146.  Plaintiffs filed a response on 18 July 2023, ECF No. 148, and the government filed a reply on 8 August 2023 ("Gov't's Am. MPSJ Reply"), ECF No. 149.  The Court held oral argument on 21 March 2024 in Akron, Ohio.  *See* 7 Dec. 2023 Scheduling Order, ECF No. 150.

## II.    Background

The Court's 26 July 2022 Opinion and Order addressing the parties' Motions in Limine provides the general factual background:

> Plaintiff Spectre Corporation . . . and the United States through the National Aeronautics and Space Administration . . . executed two agreements to commercialize pressure sensor technology NASA developed and patented.  The first agreement, SAA3-210 ("Space Act Agreement") executed on 22 December 2011, sets forth NASA's and Spectre's obligations to commercialize NASA's silicon-carbide sensor technology.  *See* Compl. Ex. 3 at 5–21 (Space Act Agreement), ECF No. 1-3.  The second agreement, DE-456 ("Exclusive License Agreement") executed on 14 May 2012, granted Spectre a royalty-bearing, exclusive license to practice the silicon-carbide sensor patents through 25 January 2025, the end of the patents' terms, and required Spectre to pay a $50,000 fee to NASA.  *See* Compl. Ex. 1 at 1–17 (Exclusive License Agreement), ECF No. 1-1; Compl. Ex. 2 at 1–14 (Exclusive License Agreement), ECF No. 1-2; Compl. Ex. 3 at 1–3 (Exclusive License Agreement), ECF No. 1-3.  Around the same time, Spectre applied for and received a $1,000,000 grant from the State of Ohio to commercialize the sensor technology.  *See* Compl. Ex. 3 at 23–84 (Ohio Grant), ECF No. 1-3.
>
> After delays and conflicts affecting the performance of obligations under the contracts, NASA terminated the Exclusive Licensing Agreement and halted its performance under the Space Act Agreement, allowing the Space Act Agreement to expire by its own terms.  Compl. at 4, ECF No. 1.  Plaintiff brought this action for breach of the Space Act Agreement and the Exclusive Licensing Agreement claiming $215,000 for fees paid to NASA, at least $2,000,000 for money spent on the failed project, and more than $45,000,000 in lost profits.  *See* Compl.

*Spectre Corp. v. United States*, 160 Fed. Cl. 486, 489 (2022).  At oral argument in this case, plaintiff noted, though expired at this point, it is unknown why no one else has commercialized the technology.  Tr. at 45:9–16 ("THE COURT:  But the patents have expired now, so anybody can do that. . . .  [PLAINTIFF]:  My client doesn't have the money to do it, your Honor.  THE COURT:  But why hasn't anybody else?  [PLAINTIFF]:  I don't know."); Tr. at 107:13–24 ("THE COURT:  Like we talked about from the beginning, the patents are no longer being protected, they've expired.  Why is it that someone hasn't picked up on them and made millions?  [PLAINTIFF]:  I don't know, your Honor.").

In general, plaintiff's lost profits calculations rely in part on three sources:  (1) a fact report on packaging cost information; (2) an expert report on fabrication cost information; and

(3) a fact report on sales projections. *Spectre*, 160 Fed. Cl. at 488–90. Plaintiff submitted a lost profits model which purported to estimate the profits Spectre would have enjoyed if NASA had fully performed its contractual obligations. *See* Def.'s Mot. in Limine to Exclude Portions of Jack Keller's and Nicholas Carollo's Testimony App. at 1–11, ECF No. 114-1 (Pl.'s Second Interrogs. Answers). The lost profits model comprised thirteen sheets, including a summary, projected gross sales, net lost profits, actual financial performance, projected lost profits by year, a costing matrix, and extended pricing predictions. *Id.* at 4–7 (Pl.'s Second Interrogs. Answers). None of these pages were submitted with the parties' briefing, but the government submitted a summary of the sales projections and a net profit comparison. *Id.* at 129 (Spectre SiC Sales Projections); *id.* at 130 (Net Profit Comparison).

## III.   Applicable Law

### A.   Summary Judgment Standard

The Court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A court shall not grant summary judgment if "the dispute about a material fact is 'genuine.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is considered genuine if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* "In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor." *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) (citing *Anderson*, 477 U.S. at 255). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 248). "Contract interpretation is a matter of law and thus amenable to decision on summary judgment." *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); *see, e.g., NVT Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998).

The party seeking summary judgment bears the burden of establishing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party has met this burden, the burden shifts to the non-movant who must present sufficient evidence to show a dispute over a material fact allowing a reasonable factfinder to rule in its favor. *Anderson*, 477 U.S. at 256–57. The evidence does not need to be admissible, but mere denials, conclusory statements, or evidence not significantly probative will not defeat summary judgement. *Celotex*, 477 U.S. at 322–24.

### B.   Lost Profits

This court has noted, under Federal Circuit precedent for lost profits, "it would be the *rara avis,* indeed, that could merit summary judgment." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223, 236 (2003). Nevertheless, "the factual predicate of any expert's opinion must find support in the record and . . . 'mere "theoretical speculations" lacking a basis in the record will not create a genuine issue of fact' . . . for lost profits." *Standard Fed. Bank v.*

*United States*, 62 Fed. Cl. 265, 288 (2004) (quoting *Novartis Corp v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001)).

In making a case for lost profits for breach of contract, a litigant must prove by a preponderance of the evidence: "(1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting; (2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty." *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010). To prove causation, the party asserting lost profits has the burden to "establish a plausible 'but-for' world" if breach had not occurred. *S. Nuclear Op. Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011) (quoting *Yankee Atomic Elec. Co. v. United States,* 536 F.3d 1268, 1273 (Fed. Cir. 2008)). "In other words, the plaintiff bears the burden of demonstrating 'what might have been' absent the breach." *Stockton E. Water Distr. v. United States*, 109 Fed. Cl. 760, 781 (2013) (citing *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001)). To determine "what might have been," plaintiff must present two plausible estimates: avoided costs (i.e., those costs which would have been incurred but for the breach) and projected revenue.[2] *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages."); *S. Nuclear*, 637 F.3d at 1304. It is plaintiff's burden to prove both of these values by a preponderance of the evidence. *Id.*

If the "calculation[s] [are] speculative as a matter of law," however, a court may "grant[] defendant's motion for summary judgment as to plaintiff's lost profits claim." *S. Nat. Corp.*, 57 Fed. Cl. at 305 (citing *Fifth Third*, 55 Fed. Cl. at 241–42). If there is an absence of evidence in the record as to plaintiff's damages for breach of contract, "the Court of Federal Claims [cannot] perform the necessary comparison between the breach and non-breach worlds and thus [cannot] accurately assess [plaintiff's] damages." *Yankee Atomic*, 536 F.3d at 1273 (first citing *Glendale Fed. Bank*, 239 F.3d at 1380); and then citing *Bluebonnet Sav. Bank FSB v. United States*, 67 Fed. Cl. 231, 238 (2005)). The Court therefore "ha[s] the obligation to hold [a plaintiff] to that burden." *Id.*

## IV.   Parties' Arguments

The government alleges plaintiff cannot establish a non-breach world necessary to support a claim of lost profits. Gov't's Am. MPSJ at 10 (citing *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed. Cir. 2008)). According to the government, establishing a non-breach world requires proving by a preponderance of the evidence both (1) projected revenue and (2) avoided costs, both of which the government claims plaintiff cannot do. *Id.* at

---

[2] Despite largely failing to address the point in its brief, plaintiff was unclear on the government's use of "avoided costs," but agreed on the general framework for determining lost profits by assessing projected costs and expenses in plaintiff's lost profits model. Tr. at 11:18 ("[GOVERNMENT:] So it becomes an essential element for Spectre to prove, could you make any money on this? How much would it cost you? At the prices you propose to sell them at, would it be more expensive for you to make them since every sale is a loss for you? . . . [PLAINTIFF:] I don't disagree . . . . We had everything that Spectre anticipated incurring."); Tr. at 13:5–9 ("[THE COURT:] I think we're all in agreement that analysis of costs at a minimum must be taken into account. Correct, [plaintiff]? [PLAINTIFF]: Yes.").

11 (citing *S. Nuclear Op. Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011)).  Further, the government alleges plaintiff has failed to establish lost profits with reasonable certainty.  *Id.* at 32.

### A.    The Government's Arguments Plaintiff Cannot Establish Avoided Costs

The government alleges the record fails to provide any evidence plaintiff avoided any Silicon Carbide ("SiC") die production costs, packaging costs, or high-temperature electronics costs.  *Id.* at 11–12.  For the die production costs and packaging, the government contends "Spectre's lost profits model relied entirely on one estimate, provided by its inexpert employee, Jeff Votypka, which was [previously] excluded by [the] Court."  *Id.* at 12.  Without Mr. Votypka's estimates, the government argues plaintiffs lack "an appropriate estimate of the unit cost, or the cost to Spectre to produce a pressure sensor."  *Id.*  For example, the government notes plaintiff's projected production costs include a "unit cost" of $376.39 per sensor, which is based in part on excluded SiC die fabrication and packaging costs.  *Id.* at 13.  Without this estimate, the government argues "it becomes impossible to calculate the profit from any sale."  *Id.*  The government acknowledges the record may include a substitute for calculating packaging costs by way of "the cost Sienna Technologies charged NASA to package the sensors it manufactured and delivered to Spectre during performance of the agreements."  *Id.*  These costs, however, are "nearly 30 times the estimate" provided by plaintiff's excluded witness, Mr. Votypka, which the government indicates "would eviscerate any alleged lost profits."  *Id.* at 14.  According to the government, even if Mr. Votypka's estimates are considered, they do not include "any accompanying analysis or specific calculation regarding the packaging," which Mr. Votypka purportedly admitted in his deposition.  *Id.* (citing Gov't's Am. MPSJ App. at 87–88 (Votypka 21 Jan. 2021 Dep. Tr. at 250:25–252:21)).  To the extent Mr. Votypka does explain any corresponding methodology, the government states his estimate "was made up of just [adding] a few line items from his cost analysis."  *Id.*  Without any additional evidence of a lower packaging cost, the government argues plaintiff cannot prove avoided costs.  *Id.* at 17.

For high-temperature electronics, the government contends "Spectre has failed to account for the use and cost of high temperature conditioning electronics."  *Id.* at 18.  According to the government, plaintiff's witnesses repeatedly testified Spectre's sensors were developed for use in high-temperature applications, but the electronics "burn out at 120°C."  *Id.* (first citing Gov't's Am. MPSJ App. at 123–25 (Carollo 1 Oct. 2019 Dep. Tr. at 67:25–69:12); and then citing Gov't's Am. MPSJ App. at 105 (Carollo 1 Oct. 2019 Dep. Tr. at 30:22–23)).  The government accordingly contends "Spectre would need to acquire, or possibly develop, high-temperature electronics that would allow the SiC sensors to actually fulfill their purpose in high-temperature applications."  *Id.*  The government argues its expert, Dr. Knobloch, provided unrebutted testimony noting this concern.  *Id.* at 19 (citing Gov't's Am. MPSJ App. at 153 (Dr. Knobloch Report)).  Without a plan for addressing when and how these high-temperature electronics would be needed, the government argues plaintiff cannot provide the basis of a lost profits model.  *Id.* at 19–20.

Plaintiff, in its only substantive response on avoided costs, argues the government's high-temperature electronics arguments fail due to misunderstandings of Spectre's sensor technology.  Pl.'s Resp. at 14.  Plaintiff indicates its sensor has a design which "allows the electronics to be

remote from the hot sensing environment." *Id.* Similarly, plaintiff states Spectre's "digital electronics . . . allow the performance characteristics of each module to be mapped to a chip to correct for thermal variations that occur when the sensing element is heated." *Id.*

### B.   The Government's Arguments Plaintiff Cannot Establish Actual Revenue

The government contests Spectre's sales projections, which the government characterizes as "consist[ing] entirely of unsupported speculation and impermissible lay opinion testimony of Spectre's sales force that does not reflect the historical performance of Spectre in the pressure sensor market." Gov't's Am. MPSJ at 20. The government contends Spectre has always lacked evidence to support its sales projections, even before the Court granted the government's Motion in Limine and excluded plaintiff's sales projections. *Id.* at 21. Specifically, the government notes: "Spectre never intended or attempted to obtain expert testimony to support or replace its sales projections, or provide sales projections testimony that would comply with this Court's order and the rules of evidence. Spectre's untimely submission of evidence in December 2022 did not include any updated sales projections, or additional supporting evidence for its sales projections . . . [which] Spectre confirmed . . . at [a] January teleconference with the Court." *Id.* (citing 19 Jan. 2023 Status Conference Tr. at 12:12–19, ECF No. 141).

The government contends plaintiff's lay witnesses, though excluded, nevertheless fail to support any conclusion of lost profits. *Id.* at 20. According to the government, plaintiff's witnesses, Mr. Keller and Mr. Carollo, provided "opinion testimony . . . in creating these sales projections [which] go[] far beyond that which is permissible for lay opinion testimony . . . [and] [t]hese lay witnesses admit they have no experience in projecting damages." *Id.* The Court's Order excluded sales projections and testimony from Mr. Keller and Mr. Carollo which were based on "communications with plaintiff's customers," sales projections which were based on "scientific, technical, or specialized knowledge," and sales projections which were "based on theoretical sales." *Id.* at 21 (quoting *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 503 (2022)). The government states plaintiff never provided any expert testimony on projected revenue at any point in litigation. *Id.* at 20.

To the extent plaintiff provides evidence of sales to customers, the government argues this testimony is hearsay, in accordance with the Court's Order granting the government's Motions in Limine. *Id.* at 22 (citing Def.'s Mot. in Limine to Exclude Portions of Jack Keller's and Nicholas Carollo's Testimony at 16–18, ECF No. 114). The government contends hearsay applies to both Spectre's proffered evidence of previous sales as well as Spectre's "projected sales to 'miscellaneous distributors.'" *Id.* The previous sales, according to the government, were addressed and excluded in the Court's Order on the government's Motions in Limine. *Id.* (citing *Spectre*, 160 Fed. Cl. at 503, 505). As for "miscellaneous distributors," the government argues these distributors are "intermediate sellers of pressure sensors . . . [and] Spectre's belief that these distributors would sell the projected volumes of SiC sensors is [] based on the word of those distributors, and their undisclosed communications with their undisclosed customers." *Id.* (citing Gov't's Am. MPSJ App. at 37 (Keller 1 Oct. 2019 Dep. Tr. at 55:10–14)). Likewise, the government notes the Court excluded Spectre's sales projections because they were based on nonexpert testimony "based on scientific and technical knowledge." *Id.* at 23 (citing *Spectre*,

160 Fed. Cl. at 505).  The government therefore concludes Spectre has provided no admissible evidence to support its sales projections.  *Id.*

Lastly, the government argues Spectre's sales projections are "not grounded in Spectre's historical experience" and ignore competition.  *Id.* at 24.  Spectre's "projected pricing and quantities," says the government, "far outstrip its previous experience."  *Id.* at 25.  The government contends plaintiff's graphs are misleading, providing "unrealistic and unsupported assumptions," which—when re-scaled—indicate a projected "explosion of unprecedented success."  *Id.* at 27.  The government contends these projections assume Spectre will "sell hundreds of thousands of dollars worth of SiC sensors in 2012, before performance of the Space Act Agreement, and thus before technology transfer and field trials, were even complete."  *Id.* The government sums up this argument by stating:

> [The backdrop of this case is] Spectre's attempt to sell prototype NASA technologies, never-before commercialized, to customers it has never sold to before, in markets it has never sold in before, for applications it has never been used for before, with no evidence of success in field trials for any real-world application, nor any sales history at all.  Any one of these assumptions requires expert testimony to establish, and Spectre relies on them all without any marketing or sales expert analysis to support its position.

*Id.* at 28.  The government accordingly contends plaintiff's experts "have no historical experience to support the above assumptions, and no historical experience in rapid growth business founded on the commercialization of prototype technology" and cannot support plaintiff's projections.  *Id.*  As plaintiff's model purportedly does not provide "any analysis or consideration of Spectre's potential competitors, their competing products, or their expected responses to Spectre's entry into the market," the government therefore contends the projections are unrealistic and unsupported.  *Id.* at 29–30.  The government cites its own expert, who testified both to the necessity of assessing competition in projecting sales as well as potential competing products that were in development at the time of Spectre's program.  *Id.* at 31.  The government accordingly contends plaintiff cannot prove lost sales.

Plaintiff responds to the government's arguments, asserting its sales projections, which "far exceed[] its historical performance," are rational.  Pl.'s Resp. at 11.  Plaintiff contends: "[T]he market is so large that it is rational to believe that it could sell every pressure sensor it manufactured, even if it doubled production of the generic product.  Spectre's knowledge of the market was deep enough to know that it could sustain such sales at higher price points . . . ."  *Id.* at 11–12 (footnote omitted).  As further evidence, plaintiff argues NASA "licensed [its] patents to Spectre based on its understanding that Spectre—with NASA's assistance—could successfully exploit the patents."  *Id.*

Plaintiff argues the government cannot disprove plaintiff's projections because the government only attacks plaintiff's model but has not provided substitute projections.  *Id.* at 13. Plaintiff takes issue with "Dr. Knobloch's opinion that the aluminum nitride cannot be brazed to Kovar using nick[e]l[] as a filler material . . . [and] the [g]overnment declin[ing] . . . to identify what the proper fill material would be and . . . the [ultimate] manufacturing costs."  *Id.*

According to plaintiffs: "[T]he Government puts on no evidence to establish that the proper material would result in a material change in Spectre's costs or the bottom line. As such, the Government has failed to establish that there is no issue of material fact by disagreeing with Spectre." *Id.* Plaintiff also contests the government's use of Sienna Technologies' packaging costs as "inadmissible hearsay," contending the government cannot prevent Spectre's sales personnel from testifying while "the [g]overnment can somehow testify as to what manufacturing costs are at Sienna Technologies." *Id.*

### C.    Plaintiff's Supplemental Arguments and The Government's Reply

Plaintiff admits "should the [Court's Motion in Limine] rulings stand," "that would be the end of [plaintiff's] lost profits case." *Id.* at 6. Much of plaintiff's brief is directed to addressing the Court's previous rulings, rather than responding to the government's Motion for Partial Summary Judgment. For example, plaintiff begins its response by citing RCFC 54(b), a rule covering motions for reconsideration. *Id.* at 1. Despite referring to the Court's Order granting the government's Motions in Limine as "preliminary rulings," plaintiff does not submit a motion for reconsideration. *Id.* Instead, plaintiff's 16-page brief largely expresses disagreement with the Court's previous ruling and provides little response to the Amended Motion for Partial Summary Judgment. The brief confusingly states: "Nobody expects that The People's Court will operate without rules, but they might expect some latitude. . . . [A]llowance of the [excluded] evidence would have furthered this court's reputation as The People's Court." *Id.* at 3, 4.

Plaintiff next provides the Court with "[c]omments on the [s]tandard of [r]eview" for summary judgment, where plaintiff states "the [g]overnment is correctly quoting the Federal Circuit, [but] the Federal Circuit erroneously quoted the Supreme Court." *Id.* at 5. According to plaintiff, "this is not a case that should be amenable to summary judgment" because the government "cleverly attempted to skirt [the summary judgment] standard by filing motions in limine to dispose of the evidence under a lower standard so that it could pretend there are no genuine issues of fact." *Id.* Plaintiff alleges the Court's Order failed to consider a declaration from two of plaintiff's witnesses, Dr. Spangler and Mr. Keller, indicating "[h]ad these witnesses been presented at trial, voir dire would have been conducted during which each witness could explain their backgrounds and experience in detail." *Id.* (first citing Resp. to Mot. in Limine Ex. 1, ECF No. 121-1 (Decl. of Dr. Leland "Chip" Spangler); and then citing Decl. of Jack Keller, ECF No. 122). Plaintiff argues "it appears the [C]ourt did not even consider that testimony, much less consider it in the light most favorable to Spectre." *Id.* Plaintiff again acknowledges, "[a]lthough [the Court's] rulings are preliminary and subject to change," "should the preliminary rulings stand" plaintiff's lost profits case fails if its costs or sales projections are inadmissible. *Id.* at 6.

After outlining allegedly "undisputed facts" related to the contract as a whole, rather than lost profits, *id.* at 6–8, plaintiff turns to sales projections. Plaintiff contends its sales projections "are connected to Spectre's historical sales and are rationally based on [the witnesses'] perceptions drawn from many years of selling silicon pressure sensors to countless customers." *Id.* at 9 (citing Keller Decl.). Plaintiff states it "attempted to do that in the materials presented on the motions in limine [but] the [g]overnment's memorandum inspires further points." *Id.* First,

plaintiff alleges a "connection between" its lost profits model and historical sales, as "Spectre has never manufactured for inventory and has always shipped its entire plant output to pending orders, so it was entirely rational to believe that it could sell at least its historical output armed with a cutting edge, enhanced product that could be sold at a lower price than competitors." *Id.* Second, plaintiff argues "Spectre's historical sales were just a drop in the market bucket and it's entirely rational to believe that it could double those sales by selling a competitively priced product that could operate at much higher temperatures and in much harsher environments than traditional silicon sensors." *Id.* at 10.

Plaintiff contests the Court's Order granting the government's Motions in Limine, arguing the Court "missed the point" on Spectre's lack of experience selling SiC sensors. *Id.* Plaintiff alleges the Court overlooked the similarity of the new SiC sensors, stating "[i]t is not in the least bit irrational to conclude that customers which had purchased [sensors] that could only operate reliably up to 150°C would also purchase sensors that could operate reliably up to 300°C." *Id.* The government's position, plaintiff contends, misunderstands "a fundamental . . . nature of sales," as Spectre "could have competed successfully" with other sensors on the market "because the SiC sensor could be sold at a much lower price." *Id.* at 12. Plaintiff also states the Court "may have [improperly] given credence" to the government's argument plaintiff's lost profits model fails to account for competition. *Id.* at 11. According to plaintiff, "[i]t is entirely rational to conclude that if Spectre had years of experience . . . it could continue to experience that level of sales with new, improved Gizmos." *Id.*

Plaintiff states "legal arguments have been addressed in previous briefings and it seems unnecessary to respond to each and every one at this point," admitting "if Spectre is prevented from putting on testimony as to its projected sales and expenses, [then] it has no case and cannot prove lost profits." *Id.* Plaintiff contends "sales projections really cannot be found to be deficient as a matter of law" because "lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *Id.* at 15 (quoting *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001)). Responding to the government, plaintiff contends the government's cited cases show "parallels" but plaintiff's evidence in this case "creates a genuine issue of material fact, not a basis for summary judgment." *Id.*

In its Reply, the government contends much of plaintiff's brief is unresponsive to the government's Motion for Partial Summary Judgment. To the extent plaintiff responded, the government argues plaintiff "cannot defeat summary judgment by supporting . . . meteoric profit projections with only the inadmissible speculation of its sales force." Gov't Am. MPSJ Reply at 3. Most of plaintiff's arguments, states the government, are rehashed arguments from the Motions in Limine, but plaintiff has not moved for reconsideration. *Id.* at 4, 9. To the extent the Court did not address declarations from Dr. Spangler or Dr. Keller, the government argues "there is no requirement that the Court itemize every piece of evidence it considered in making a ruling." *Id.* at 5 (first citing RCFC 52(a)(3); then citing *Shapiro v. Sec'y of HHS*, 101 Fed. Cl. 532, 540 (2011); and then citing *Lesch v. United States*, 612 F.3d 975, 981 (8th Cir. 2010)); *see also id.* at 5 n.4 ("This is incorrect. The Order acknowledges and cites to Dr. Spangler's declaration . . . ."). To the extent plaintiff argues an evidentiary hearing is necessary prior to adjudication, the government contends this court "has repeatedly ruled there is nothing improper

about adjudicating evidentiary issues *in limine* prior to a summary judgment motion." *Id.* at 7 (citing *Spectre*, 160 Fed. Cl. at 495). The government responds to plaintiff's argument the government's submitted evidence from Sienna Technologies is "inadmissible hearsay," indicating the invoice is admissible under the business records exception of FRE 803(6). *Id.* at 9. Furthermore, the government asserts it "does not have the burden of proof for Spectre's costs in the but-for world," and the government proffered the evidence only to "illustrate[] the magnitude of the hole in Spectre's evidentiary case." *Id.* at 10.

Lastly, to the extent plaintiff argues lost profits cases are only decided on summary judgment in "exceptional circumstances," the government contends this is a rare case due to plaintiff's lack of admissible evidence for "key components of its costs . . . [and] sales projections." *Id.*

## V.    Lost Profits Test, Prong One:  Whether the Lost Profits Were Reasonably Foreseeable or Actually Foreseen

Plaintiff admits "should the [Court's Motion in Limine] rulings stand," "that would be the end of [plaintiff's] lost profits case." Pl.'s Resp. at 6. Regarding the Court's previous rulings, plaintiff confirmed this position at oral argument: "I don't agree with your Honor's ruling on those motions, but I do agree that it does knock out the lost profits case." Tr. at 35:5–7. Despite this admission, plaintiff maintains "the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if there are facts in dispute." Pl.'s Resp. at 14–15 (quoting *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001)). The Court therefore turns to assessing the remaining admissible evidence to determine whether a dispute of material fact exists over plaintiff's claim for lost profits.

Both parties agree plaintiff has the burden to establish lost profits under the appropriate three-part test outlined in *Anchor Savings Bank*:  "(1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting; (2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty." *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010); Tr. at 6:21–7:12.

Under the first prong of the *Anchor Savings Bank* test, plaintiff must establish "the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting" by a preponderance of the evidence. *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010). The government's Amended Motion for Partial Summary Judgment does not contest the "reasonably foreseeable or actually foreseen" prong of the lost profits test and instead argues only plaintiff has "failed to adduce evidence . . . with respect to" prongs two and three. Gov't's Am. MPSJ at 1. The government likewise does not contest plaintiff could establish breach for purposes of its Motion for Partial Summary Judgment. Gov't's Am. MPSJ at 1 n.1. The government confirmed at oral argument it would "contest those matters at trial, but they're not at issue in [this] motion." Tr. at 6:10–12; Tr. at 7:18–22 ("[THE COURT:]  For the purposes of this motion, are you assuming that the first prong of lost profits is met but would plan to contest that at trial if the motion is denied?  [GOVERNMENT]:  That's

correct."). The Court accordingly assesses only the second and third prongs of the lost profits test in determining whether a material dispute of fact exists regarding lost profits.

## VI.   Lost Profits Test, Prong Two:  Whether the Lost Profits Were Caused by the Breach

The government's primary argument for partial summary judgment is plaintiff has failed to establish the second prong of the lost profits test, causation:  i.e., "the loss of profits was *caused* by the breach."  *See Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010) (emphasis added).  To prove causation, a party asserting lost profits has the burden to "establish a plausible 'but-for' world," or a hypothetical revenue and cost projection for if breach had not occurred.  *S. Nuclear Op. Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011) (quoting *Yankee Atomic Elec. Co. v. United States,* 536 F.3d 1268, 1273 (Fed. Cir. 2008)).  "In other words, the plaintiff bears the burden of demonstrating 'what might have been' absent the breach."  *Stockton E. Water Distr. v. United States*, 109 Fed. Cl. 760, 781 (2013) (citing *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001)).  This exercise requires plaintiff to present two plausible estimates:  First, plaintiff must establish its avoided costs, or the costs plaintiff would have incurred under full performance, such as manufacturing costs.  Second, plaintiff must establish its projected revenue under full performance of the contract.  *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages."); *S. Nuclear*, 637 F.3d at 1304.  It is plaintiff's burden to prove *both* values by a preponderance of the evidence at trial—if plaintiff cannot establish just one of these values it cannot support its lost profits claim.  *Id.*  According to the government, plaintiff could not establish lost profits at trial because "Spectre's failure to produce admissible evidence to [establish a but-for world] is fatal."  Gov't Am. MPSJ at 9.  The Court accordingly turns to the admissible evidence to determine whether a dispute of material fact exists over plaintiff's ability to establish avoided costs and projected revenue.

### A.   Whether Plaintiff Can Establish Its Avoided Costs Under the Causation Prong of the Lost Profits Test

The government alleges, as a matter of law, plaintiff cannot establish "its avoided costs, or what it would have cost to operate the enterprise in question with full Government performance."  Gov't Am. MPSJ at 11 (quoting *S. Nuclear Op. Co.*, 637 F.3d at 1304).  Specifically, the government contends plaintiff "no longer has any estimate of the cost to commercialize the two patents it licensed from NASA."  *Id.* at 12.  The costs allegedly lacking any estimate in the record include:  SiC die manufacturing costs, packaging costs, and the costs necessitated by manufacturing high-temperature electronics.  *Id.* at 11.  According to the government, plaintiff cannot establish its lost profits case as a matter law because "Spectre's lost profits model relied entirely on one estimate, provided by its inexpert employee, Jeff Votypka, which was excluded."  *Id.* at 12.  At oral argument, plaintiff acknowledged it could not establish lost profits, stating the "effect" of granting the motions in limine is "a simple formula":  "Lost profits equals sales revenues minus cost of good[s] sold.  And if you knock out the sales revenues, you can't calculate lost profits.  If you knock out the cost of goods sold, you can't

calculate lost profits.  If you knock out both of them, you can't calculate lost profits. . . .  I don't agree with your Honor's rulings on those motions, but I do agree that it does knock out the lost profits case."  Tr. at 34:22–35:7.  As plaintiff acknowledges its lost profits case is unsupported, there is no genuine dispute of material fact regarding lost profits and the avoided costs prong.  The Court must accordingly grant the government's motion for partial summary judgment.

Even if the Court were to ignore plaintiff's concession of its lost profits case, however, plaintiff's claim for lost profits must not be speculative.  *S. Nat. Corp. v. United States*, 57 Fed. Cl. 294, 305 (2003) (indicating if plaintiff's "calculation[s] [are] speculative as a matter of law," a court may "grant[] defendant's motion for summary judgment as to plaintiff's lost profits claim" (citing *Fifth Third*, 55 Fed. Cl. At 214–42)).  The Court accordingly assesses the evidence in the record admissible after the Court's motion in limine order to determine whether there is a further material dispute of fact over whether plaintiff can establish avoided costs.  *Id.*; *see also Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision:  'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" (quoting *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969)).  The Court accordingly turns to the evidence in the record for avoided costs to determine if it is speculative as a matter of law.  *S. Nat. Corp.*, 57 Fed. Cl. at 305.

First, the government alleges there is no evidence in the record supporting plaintiff's SiC die production costs, as the Court's motion in limine order excluded the only available production estimates.  Gov't Am. MPSJ at 11–12; *see Spectre Corp. v. United States*, 160 Fed. Cl. 486, 490–91 (2022) ("Like Mr. Votypka's packaging cost estimate, Dr. Spangler's cost estimate for fabricating silicon carbide cpressor sensor dies contributes to the overall cost to produce the pressure sensors . . . .").  According to the government, "Spectre's lost profits model was wholly dependent upon the excluded analysis of Drs. Spangler and Melkonian to provide the SiC die cost estimate."  Gov't Am. MPSJ at 12.  Plaintiff's Response does not cite any analysis to counter the government's argument.  The only briefed production estimates are those cited by the government:  the government's brief cites Spectre's 2013 manufacturing cost estimates— excerpted from plaintiff's lost profits model—as an example of the lack of admissible evidence supporting a lost profits claim.  Gov't Am. MPSJ at 12–13.  The estimates note a total unit cost of $376.39, including both a die cost and a sensor packaging cost.  *Id.*  At oral argument, plaintiff confirmed the $376.39 value was the total cost of producing the SiC sensor.  Tr. at 58:1–18 ("THE COURT:  So, in order to take a look at the evidence in the record that plaintiff could rely on, turning to the projections from Spectre on page 15 of the appendix, which was labeled 'Presentation Cover 2013,' the dollar value that Spectre came to was $376.  Is that the total unit cost of producing the silicon carbide sensor?  [PLAINTIFF]:  I think so, your Honor. . . .  I haven't reviewed this recently.  But, yes, that was the workup.");  *see also* Tr. at 73:8–21 (THE COURT:  [$]376 is the total sensor cost?  [GOVERNMENT]:  Yes.  That's right, your Honor.").  Plaintiff also confirmed this calculation from Mr. Votypka and the underlying cost of purchasing a die ($24.25) relied on Dr. Spangler's excluded testimony.  Tr. at 58:14–18 ("THE COURT:  This is what Mr. Votypka did?  [PLAINTIFF]:  Yes.  And it incorporated the die cost from Mr. Melkonian as adjusted by Dr. Spangler.");  Tr. at 61:1–8 ("[THE COURT:]  [O]ne specific note is

the purchase of the die, $24[.25], where did that come from?  Is there an invoice?  [PLAINTIFF]: No.  We never purchased that.  That was Dr. Melkonian's estimate as adjusted by Dr. Spangler based on production costs."); Tr. at 63:13–17 ("THE COURT:  I'm just wondering where the $24[.25] is supported now so that it's not— [PLAINTIFF]:  It was Spangler's estimate . . . ."). In its 2022 Exclusion Order, the Court granted the government's motion to exclude "Dr. Melkonian's materials and the portions of Dr. Spangler's report and testimony relying on them" because "plaintiff [could not] show by a preponderance of proof Dr. Spangler's cost estimate and portions of his report reasonably rely upon Dr. Melkonian's partial estimate."  *Spectre*, 150 Fed. Cl. at 500 (citations omitted).  As plaintiff admits Mr. Votypka's die costs estimates are "incorpora[tions]" of Dr. Spangler's excluded calculations, these cost estimates are accordingly inadmissible and cannot support a claim for lost profits.  *See* Tr. at 58:14–18.  Plaintiff provides no additional evidence supporting its die cost estimate nor the cost of the unit as a whole. Without any evidence to support its die production costs, plaintiff accordingly cannot establish the existence of lost profits.  *See Standard Fed. Bank v. United States*, 62 Fed. Cl. 265, 288 (2004) ("'[M]ere "theoretical speculations" lacking a basis in the record will not create genuine issue of fact' . . . for lost profits." (quoting *Novartis Corp v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001)).

In addition, the government alleges no evidence can support plaintiff's packaging cost estimates, which Mr. Votypka also relied on to project a total unit cost.  Gov't's Am. MPSJ at 13.  Plaintiff admits its estimates come exclusively from Mr. Votypka's excluded testimony.  Tr. at 83:4–8 ("THE COURT:  What is in the record for packaging cost estimates?  [PLAINTIFF]: Without Votypka's testimony, evidence, there's nothing.").  In the Court's Exclusion Order, the Court determined "Mr. Votypka's theoretical packaging cost estimate is not 'rationally based on [his] perception' because he is unfamiliar with the packaging process at issue."  *Spectre*, 160 Fed. Cl. at 495.  The Court accordingly determined "Mr. Votypka's packaging cost estimate [was] . . . inadmissible as lay testimony as it is 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'"  *Id.* at 495 (citing FED. R. EVID. 701(c)). Again, plaintiff provides no alternative evidence of packaging cost, and only the government discusses plaintiff's packaging costs in its briefs, while plaintiff does not.  In fact, where the government attempted to support its estimates by discussing substitute packaging evidence presented by plaintiff, plaintiff attempts to argue this substitute evidence is "hearsay."  Gov't's Am. MPSJ at 13 ("Second, while there is a substitute packaging cost–the cost Sienna Technologies charged NASA to package the sensors it manufactured and delivered to Spectre during performance of the agreements–that packaging cost is of no help to Spectre."); Pl.'s Resp. at 13 ("Sienna's outrageous charges are inadmissible hearsay but are also not evidence of costs but evidence of what a sole-source provider can extract from NASA.").  The packaging estimate from Sienna Technologies stems from prototype packaging performed during sensor testing. Compl. ¶ 66 ("NASA promised . . . to perform functional testing on all sensors received back from Sienna Technologies, and then to test the functional sensors for compliance with the performance specifications, the results to be shared with Spectre.").  At oral argument, plaintiff redoubled its argument this alternative cost estimate from Sienna should not be included.  Tr. at 82:5–13 ("THE COURT:  So should the Sienna Technologies estimate—you object to it and it should not be looked at by the Court?  [PLAINTIFF]:  It's not an estimate.  It's an invoice.  THE COURT:  You object to it as hearsay?  [PLAINTIFF]:  Well, yes.").  Plaintiff agreed, if the Sienna Technologies packaging cost was included, it would not make a profit.  Tr. at 89:22–25

("[PLAINTIFF]:  Your Honor, I agree with that completely.  If packaging actually cost $1,650, we wouldn't make a profit.").  With plaintiff's agreement the only die packaging cost estimates are those excluded in the Court's previous order, there are accordingly no estimates to support plaintiff's avoided costs.  Without additional evidence, plaintiff cannot establish avoided costs sufficient to support a claim for lost profits.  *See Standard Fed. Bank*, 62 Fed. Cl. at 288.

The government further alleges plaintiff's cost projections are deficient because "Spectre would need to acquire, or possibly develop, high-temperature electronics that would allow the SiC sensors to actually fulfill their purpose in high-temperature applications." Gov't's Am. MPSJ at 18.  Plaintiff's avoided costs are deficient according to the government because "Spectre has provided no plan or cost analysis for acquiring and utilizing high-temperature electronics, and further, no analysis as to whether and which of its proposed high-temperature applications would be free of the need for them."  *Id.* at 19.  Plaintiff admitted at oral argument Spectre has no experience producing high-temperature products.  Tr. at 91:6–8 ("[THE COURT:]  [H]as Spectre made high-temperature products in the past.  [PLAINTIFF]:  No.").  In contrast to its die cost and packaging arguments, the government's contention regarding high-temperature electronics is not that plaintiff submitted incorrect estimates, but rather plaintiff did not account for the cost of developing *any* high-temperature electronics.  Gov't's Am. MPSJ at 19.  In order for the Court to hold these projections deficient for failing to include high-temperature electronics, however, the Court would need to hold these high-temperature electronics *as a matter of law* are necessary to produce plaintiff's sensors.  The dispute over what specific temperature performance levels are appropriate for plaintiff's technology, though, is not an issue of law but an issue of fact.  *See* Gov't's Am. MPSJ at 18 ("The type of pressure sensors at issue in this case *generally require* conditioning electronics to convert the millivolt output produced by the circuit on the sensor to a voltage or current output that can be used by customers." (emphasis added)).  At this stage, the Court cannot say plaintiff's failure to include high-temperature electronics in its avoided cost renders its avoided costs deficient as a matter of law; there accordingly exists a material dispute of fact over whether high-temperature electronics should have been included in avoided costs.  *Fifth Third*, 55 Fed. Cl. at 235 ("The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law." (first citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250–51 (1986); and then citing *Jay v. Sec'y of HHS*, 998 F.2d 979, 982 (Fed. Cir. 1993))).

In summary, plaintiff admits the record is lacking in admissible evidence to establish the unit cost of production.  Tr. at 34:22–35:7 ("[PLAINTIFF:]  I don't agree with your Honor's rulings on those motions, but I do agree that it does knock out the lost profits case.").  Despite there being a question of fact whether plaintiff should have accounted for high-temperature technology development in its avoided costs, plaintiff cannot establish its die production and packaging costs, and its lost profits case is therefore deficient as a matter of law.  Without any admissible evidence of both the die cost and packaging, plaintiff cannot determine its avoided costs.  As the second prong of the lost profits test is bereft of any support—as plaintiff must establish *both* avoided costs *and* projected revenue—there is accordingly no material dispute of fact over plaintiff's lost profits case, and the government is entitled to partial judgment as a matter of law.  *Anderson*, 477 U.S. at 248; *Anchor Sav. Bank, FSB v. United States*, 597 F.3d at 1361.

**B.      Whether Plaintiff Can Establish Its Projected Revenue Under the Causation Prong of the Lost Profits Test**

The government next argues plaintiff cannot establish projected revenue under the causation prong of the *Anchor Savings Bank* test because plaintiff's sales projections are deficient as a matter of law.  Gov't Am. MPSJ at 20.  According to the government, plaintiff's sales projections are deficient for "consist[ing] entirely of unsupported speculation and impermissible lay opinion testimony . . . [which do] not reflect the historical performance of Spectre in the sensor market" and because "[the] lost profits model completely ignores market forces, such as competition."  *Id.*  In its Exclusion Order, the Court determined plaintiff's sales projections, provided by Spectre's CEO Mr. Jack Keller and salesman Mr. Nicholas Carollo, were excluded to the extent they:  (1) "predict[] future sales of silicon carbide sensors with no connection to their historical sales [and so] are not rationally based on their perception and are inadmissible under FRE 701(a)"; (2) "rely[] on Mr. Keller's or Mr. Carollo's assumptions regarding theoretically suitable applications [and] are [therefore] not based on personalized knowledge, and are likely based on technical, scientific, or specialized knowledge within the scope of FRE 702, and therefore inadmissible under FRE 701(c)"; and (3) "[are] [s]ales projections relying on out-of-court statements by nonlitigants regarding potential purchases of silicon carbide sensors [and] are [therefore] based on hearsay and are inadmissible under FRE 802."  *Spectre*, 160 Fed. Cl. at 503.  The Court permitted plaintiff an opportunity to provide updated sales projections "based on admissible evidence in the record, if any."  *Id.*  At oral argument, plaintiff confirmed it did not provide these updated projections.  Tr. at 98:10–15 ("THE COURT:  After the Court provided grace periods to provide updated sales projections in its order on the Government's motion, did you ever provide updated projections?  [PLAINTIFF]: No.").

In its Amended Motion for Partial Summary Judgment, the government provided marked-up excerpts from plaintiff's originally provided sales projections which, in the government's position, were reduced by the Court's Exclusion Order.  Gov't Am. MPSJ App. at 265 (Plaintiff's Sales Projections) (highlighting sales projections excluded based on hearsay); *id.* at 266 (Plaintiff's Sales Projections) (highlighting sales projections excluded based on scientific and technical information).  As noted *supra*, plaintiff admits in its Response Brief "if Spectre is prevented from putting on testimony as to its projected sales and expenses [then] it has no case and cannot prove lost profits."  Pl.'s Resp. at 14; *see also* Tr. at 34:23–25 (plaintiff) ("[I]f you knock out the sales revenues, you can't calculate lost profits.").  Plaintiff also noted confusion with the Court's Exclusion Order at oral argument, stating "I thought [the Order] knocked out all of [the sales projections], but maybe I didn't read it properly."  Tr. at 36:9–11.  This confusion may be part of why plaintiff's Response Brief does not cite or directly reference the government's marked-up sales projections.  *See* Pl.'s Resp. at 9–14.  Despite plaintiff's failure to address these contentions, the Court accordingly turns to the briefed portions of plaintiff's lost profits model, considering plaintiff's "Detailed Thoughts on Sales Projections" where applicable.  *See* Pl.'s Resp. at 9.  The Court assesses whether plaintiff's lost profits model, including plaintiff's sales projections, could establish avoided revenue or whether it is deficient as a matter of law.  *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not

perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages."); *S. Nuclear*, 637 F.3d at 1304.

First, regarding plaintiff's sales projections, the government contends "[t]he Court's exclusions of hearsay testimony remove Spectre's support for a significant portion of its projected sales." Gov't's Am. MPSJ at 22. The government asserts sales to customers IM Flux, DM-Sensors, SWRI, FW Murphy, and Flexpipe are based on hearsay, as recognized by the Court's Exclusion Order. *Id.* (citing Def.'s Mot. in Limine to Exclude Portions of Jack Keller's and Nicholas Carollo's Testimony at 16–18, ECF No. 114); *see Spectre*, 160 Fed. Cl. at 503 ("To establish lost profits, plaintiff relies on conversations with customers to argue a representative customer would buy silicon carbide sensors . . . . [These] statement[s] [are] submitted for the truth of the matter asserted and [are] inadmissible hearsay."); *id.* (citing deposition testimony for projected sales based on conversations with DM-Sensors, SWRI, FW Murphy, and Flexpipe). Although plaintiff's Response Brief does not address the specific customers allegedly rendered inadmissible by the Court's Exclusion Order, at oral argument plaintiff noted disagreement with the government's marked-up exhibit. Tr. at 26:11–20 ("[THE COURT:]  I think the Government read [the Exclusion Order] and they created two marked-up versions of plaintiff's sales projections that were included in Appendix 265 and 266, highlighting which of plaintiff's projections are excluded after the motion in limine order.  Do you agree with the Government's analysis of that?  [PLAINTIFF]:  I'm sure I don't.").  When asked how the government had mischaracterized the Exclusion Order, plaintiff could only recite arguments disagreeing with the Exclusion Order itself.  Tr. at 34:2–36:11 ("[PLAINTIFF:]  I don't agree with your Honor's rulings on those motions, but I do agree that it does knock out the lost profits case.  THE COURT:  And if you agree with that, do you agree with [the government's] highlighting?  [PLAINTIFF]:  No.  THE COURT:  What's wrong with the highlighting?  [PLAINTIFF]:  Because I believe . . . this is particularized knowledge that has come to the ears of these salesmen in the course of visiting customers, potential customers, and trying to sell them these.  That's particularized knowledge. . . .  THE COURT:  Well, did the motion in limine order knock out any of the lines that are in the spreadsheet?  [PLAINTIFF]:  I thought it knocked out all of them, but maybe I didn't read it properly.").  Plaintiff accordingly failed to provide any argument for why any of its projections were *not* excluded by the Court's Exclusion Order.[3]  Indeed, the Order stated, "Plaintiff's sales projections also rely on . . . instances of hearsay" and cited various examples relating to sales projections for each of the companies noted by the government. *Spectre*, 150 Fed. Cl. at 503.  Plaintiff has provided no argument for why these sales projections survived the Exclusion Order.  The Court accordingly finds these sales projections are inadmissible and cannot support plaintiff's projected revenue. *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance,

---

[3] At oral argument, the government correctly argued plaintiff's Response was deficient in responding to the government's contentions of inadmissibility. Tr. 38:18–39:8 ("[GOVERNMENT]:  First, what should have happened in response to our motion is what you've been asking for, which is, here are the lines where it is covered by the order, we disagree with the order in the footnote and then say, here's the lines we think are covered, here's the lines that aren't covered.  What also should have happened in response is—and this is just in full candor of the Court.  I'll try to make Spectre's case for it, I guess, which is that I know from past history, documents they didn't bother to put into evidence, but I know they have past sales to Blue Origin, at least one.  I know they do."). Although the Court asked plaintiff's position on the highlighting at oral argument, plaintiff did not provide any arguments in its briefs or at oral argument, and to a significant extent accordingly waived any arguments that the government misrepresented the Court's Exclusion Order. *See* Resp.

- 18 -

the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages."); *S. Nuclear*, 637 F.3d at 1304; *Spectre*, 160 Fed. Cl. at 503.

Second, the government argues plaintiff's sales projections are insufficient to support projected revenue because they were excluded as being "based on nonexpert testimony based on scientific and technical knowledge." Gov't's Am. MPSJ at 23. As with the evidence allegedly excluded as hearsay, the government provides a highlighted sheet noting the evidence allegedly excluded for being expert testimony by a lay witness. Gov't's Am. MPSJ App. at 266 (Pl.'s Sales Projections). The Court's Exclusion Order noted "[because] Mr. Keller relies on his understanding of the customer's technology and its limitations, his opinion is 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702' and accordingly inadmissible under FRE 701(c)." *Spectre*, 160 Fed. Cl. at 502. When asked again at oral argument whether the government mischaracterized the Court's Exclusion Order in the attached exhibits, plaintiff could not articulate arguments for the admissibility of any sales projections and instead disagreed with the motion in limine itself. Tr. at 30:20–31:17 ("THE COURT: Can you explain what you disagree with about Mr. Hunter's example related to the top-left corner of the Flexpipe Systems line? . . . [PLAINTIFF]: Well, let me preface what I have to say by saying, we pointed out that the . . . 2000 amendments to Rule 701 said, 'For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.' . . . THE COURT: Well, that sounds like you disagree with the motion in limine."); Tr. at 33:2–11 ("[PLAINTIFF:] And, yes, he has never sold them a silicon carbide sensor. . . . [But] he's learned of those requirements, and that's particularized knowledge. And there's nothing scientific about it. Jack Keller doesn't know why it is that silicon carbide can be exposed to a certain acid but silicon can't. He's not a scientist."). Plaintiff's disagreement with the Exclusion Order, however, provides no support for determining the government improperly summarized the order's effect. In the Exclusion Order, the Court cited Mr. Keller's deposition testimony, characterizing the testimony as "explaining Rolls Royce would be motivated to purchase silicon carbide sensors due to improved chemical and heat tolerance, size limitations, and ease of installation." *Spectre*, 160 Fed. Cl. at 502. These projections, the Court noted, "rel[y] on his understanding of the customer's technology and its limitations" and are accordingly inadmissible lay testimony. *Id.* As plaintiff reiterated at oral argument, Mr. Keller is "not a scientist." Tr. at 33:14–15. Plaintiff accordingly presents no arguments indicating how the government has mischaracterized the Court's Exclusion Order. Indeed, the Court's order instead aligns with the government's contention. Without these sales projections, excluded under Rule 701(c), plaintiff is unable to establish projected future sales and revenue. *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages."); *S. Nuclear*, 637 F.3d at 1304.

Third, the government argues plaintiff's sales projections are deficient because they were excluded as being "[dis]connected [from plaintiff's] historical experience." Gov't's Am. MPSJ at 24 (cleaned up). The government contends "Spectre's projected pricing and quantities far outstrip its previous experience. Spectre has no evidence matching its projected sales prices and

quantities to historical sales." *Id.* at 25.  At oral argument, plaintiff acknowledged Spectre had no experience in selling SiC sensors.  Tr. at 109:9–110:4 ("THE COURT:  But Spectre has never sold sensors for these temperature ranges before?  [PLAINTIFF]:  Only a few exist, your Honor.  They didn't exist.  It was a totally new thing.").  Furthermore, plaintiff's Response Brief admits its projections are for "a totally new product with which neither Spectre nor the market had any experience."  Pl.'s Resp. at 10.  While SiC sensors being a new product for Spectre does not disqualify plaintiff's lost profits model *per se*, plaintiff's projections must not be speculative and must have support in the record.  *Standard Fed. Bank v. United States*, 62 Fed. Cl. 265, 288 (2004) ("[M]ere 'theoretical speculations' lacking a basis in the record will not create genuine issue of fact [for lost profits] . . . ." (quoting *Novartis Corp v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001))); *S. Nat. Corp.*, 57 Fed. Cl. at 305 (noting if plaintiff's "calculation[s] [are] speculative as a matter of law" a court may "grant[] defendant's motion for summary judgment as to plaintiff's lost profits claim." (citing *Fifth Third*, 55 Fed. Cl. at 241–42)).  The Court accordingly assesses whether plaintiff's sales projections have this support in the admissible evidence.

Plaintiff contends in response "there absolutely is a connection between Spectre's lost profits model and its historical sales."  Pl.'s Resp. at 9.  Plaintiff, however, does not explain why the sales projections the government alleged were excluded are, in fact, admissible under the Court's Exclusion Order.  Instead, plaintiff contends the sales projections are based on its historical experience because "Spectre chose to present an unnecessarily conservative model."  *Id.*  Without providing additional support, plaintiff states "Spectre's historical sales were just a drop in the market bucket and it is entirely rational to believe that it could double those sales by selling a competitively priced product that could operate at much higher temperatures and in much harsher environments."  *Id.* at 10.  According to plaintiff, "Spectre's evidence is that the market is so large that it is rational to believe that it could sell every pressure sensor it manufactured, even if it doubled production of the generic product."  *Id.* at 11.  Further, plaintiff contends the government has a "fundamental misunderstanding of the nature of sales" as good salespeople learn about market needs from both making and failing to make sales.  *Id.* at 12.  Even if plaintiff's projections are "conservative," this does not excuse plaintiff from meeting its burden.  *Yankee Atomic*, 536 F.3d at 1273; *S. Nuclear*, 637 F.3d at 1304.  At this stage, however, even "conservative" projections cannot be "speculative as a matter of law," *S. Nat. Corp. v. United States*, 57 Fed. Cl. at 305, and they must still "demonstrate 'what might have been' absent the breach."  *Stockton E. Water Distr.*, 109 Fed. Cl. at 781 (citing *Glendale Fed. Bank,* 239 F.3d at 1380).

Plaintiff's arguments *supra* do not explain why the government's arguments for the inadmissibility of plaintiff's sales projections mischaracterize the Court's Exclusion Order on historical experience.  As the government notes in its Motion, Gov't Am. MPSJ at 24, the Court's Exclusion Order observed "[p]laintiff's theoretical sales projections . . . are not based on or even congruent with its historical sales" and accordingly determined "[t]o the extent Mr. Keller's and Mr. Carollo's opinions regarding future sales depart from Spectre's past performance, their projections cannot be rationally based on their perception."  *Spectre*, 160 Fed. Cl. at 501 (citing FED. R. EVID. 701(a)).  The Court excluded these projections because:

As Spectre has only sold its legacy technology, plaintiff admitted Mr. Keller and Mr. Carollo's experience is also limited to selling the legacy technology—they have no experience selling silicon carbide sensors.  Tr. at 99:11–21, 102:25–103:6, 126:15–21, 130:8–9.  Despite lacking experience selling silicon carbide sensors, plaintiff's projected sales of these sensors are substantially greater than sales of its legacy technology.  Tr. at 143:21–144:6.  Although plaintiff asserts it would experience limitless future demand, Spectre has never performed so successfully in its past.  Tr. at 128:11–19.

*Id.*  In the instant Motion, the government contends plaintiff's 2013 sales projections, which identify a customer, a product, a quantity, a unit price, and the corresponding revenue for each customer, fall within the testimony excluded by the Court's order.  Gov't Am. MPSJ at 24–25 (citing Gov't Am. MPSJ App. at 21 (Pl.'s Sales Projections)).  Plaintiff's brief provides no response why the Court's order did not exclude these estimates.  At oral argument, plaintiff similarly provided no additional reasons beyond disagreeing with the Court's Exclusion Order.  Tr. at 98:16–99:16 ("THE COURT:  Looking at now the inadmissible evidence, the sales projections were discussed in the deposition.  Is there anything that's in that deposition from Mr. Keller that would support why a customer would buy a silicon carbide sensor?  [PLAINTIFF]: Yes.  THE COURT:  What does he testify to in order to indicate that, or is it just is his experience?  [PLAINTIFF]:  That this technology provided a sensor that would go to a higher temperature, could be exposed to harsher environments, including radioactivity, than anything else on the market, and that because of the production costs . . . that they could undersell any competitor, any of the people who were currently providing things for higher temperatures in the market.  THE COURT:  But that was just Mr. Keller's opinion based on experience? [PLAINTIFF]:  Yes.").  When asked if plaintiff's sales projection values were based on any analysis other than Mr. Keller's experience, plaintiff could not cite any other support in the record.  Tr. at 101:18–102:2 ("THE COURT:  Just looking at this, Rolls-Royce is listed as purchasing 200 of these at [$]1,500 a pop.  Where did that 200 come from?  [PLAINTIFF]:  I'm not sure why [Mr. Keller] said 200.  THE COURT:  Is there anything in the record about why he said 200?  [PLAINTIFF]:  I don't know.  I don't recall.").  Plaintiff does not refute the fact its "projected performance . . . far exceeds its historical performance."  Pl.'s Resp. at 11.  Despite projecting profits in excess of $10,000,000 per year in 2016–2018, plaintiff's actual revenue for those years do not exceed $110,000.  *See* Gov't Am. MPSJ App. at 269 (Pl.'s Net Profit Comparison).  These incongruent projections are without any support other than plaintiff citing its lay witness' "experience."  Tr. at 98:16–99:16.  Plaintiff accordingly fails to provide any argument to refute the government's contention its sales projections provide anything other than the "limitless future demand" which the Court previously indicated "are not based on or even congruent with its historical sales."  *Spectre*, 160 Fed. Cl. at 501.  Without this support, plaintiff's sales projections cannot support its projected revenue in a but-for world.  *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages.");  *S. Nuclear*, 637 F.3d at 1304.

Fourth, a similar support issue arises when comparing plaintiff's projected demand to the current lack of a market for the technology, despite the expired patents.  When asked at oral

argument why entities did not commercialize the technology once the patents expired, plaintiff could not provide an explanation. Tr. at 107:13–25 ("THE COURT: Like we talked about from the beginning, the patents are no longer being protected, they've expired. Why is it that someone hasn't picked up on them and made millions? [PLAINTIFF]: I don't know, your Honor. But lots of people across the globe have been working on high-temperature pressure sensors and high-temperature electronics. It's something that everyone has been trying to find a solution. And NASA told my client we have a solution."). The parties agreed research on the sensors may be ongoing, but plaintiff did not explain how its projected limitless demand squares with the lack of a market for the sensors today. Tr. at 45:9–19 ("THE COURT: But the patents have expired now, so anybody can do that. . . . [PLAINTIFF]: My client doesn't have the money to do it, your Honor. THE COURT: But why hasn't anybody else? [PLAITNIFF]: I don't know. This other company was licensed to patent and I don't know that there's still research going on. I suspect it has something to do with[,] although I'm not sure . . . one of the problems they were running into . . . ."). Providing facts on "background," the government noted "the status is—and I think this is undisputed among the parties—it's not on the market." Tr. at 48:5–7; Tr. at 42:3–9 ("[GOVERNMENT:] I'm not an expert, so you can't take what I'm saying here as representations of fact. I have studied this market probably more than the average person, but this is just color and background."). The government further noted "there are other patent tracks[,] . . . other silicon carbide tracks of technology[, and] [t]hey also haven't been commercialized." Tr. at 48:11–15. In combination with the other deficiencies noted in this Section, plaintiff's failure to explain this lack of a current market—despite the expired patents—suggests plaintiff's "limitless future demand," is "mere 'theoretical speculation[]'" rather than a projection grounded in its witness's historical experience or expertise. *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 501 (2022); *Standard Fed. Bank*, 62 Fed. Cl. at 288 (quoting *Novartis*, 271 F.3d at 1051); *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages."); *S. Nuclear*, 637 F.3d at 1304.

Lastly, the government contends plaintiff cannot establish projected revenue because its lost profits model fails to account for market competition. Gov't Am. MPSJ at 29–32. According to the government, "[t]his [c]ourt has not hesitated to reject lost profits models as a matter of law when those models have failed to account for market competition." *Id.* at 30. Plaintiff argues in response "[i]t is entirely rational to conclude that if Spectre had years of experience selling thousands of generic Gizmos into the market despite competition that it could continue to experience that level of sales with new, improved Gizmos." Pl.'s Resp. at 11. Plaintiff later notes, however, "the market is so large that it is rational to believe that [plaintiff] could sell every pressure sensor it manufactured." *Id.* When asked at oral argument about accounting for competition, plaintiff did not provide any additional explanation:

THE COURT: So just to confirm, competition is not anticipated in your lost profits model?

[PLAINTIFF]: Yes, it is.

THE COURT: Where?

[PLAINTIFF]:  By the sales that we make.  We make these sales in the face of competition.

THE COURT:  But where does Spectre account for and calculate competition?

[PLAINTIFF]:  I don't know how you calculate that.  You say, here's the sales— this is a huge market.

Tr. at 111:18–112:5.  Plaintiff accordingly "accounts for competition" by contending it would be unlimited in its production capacity.  Pl.'s Resp. at 11.  Plaintiff's argument is similar to one rejected by this court in *Southern National*.  *S. Nat. Corp.*, 57 Fed. Cl. 294 .  There, the court found plaintiff failed to establish lost profits—in part—because the expert "d[id] not attempt to customize the but-for world . . . by recognizing competition."  *Id.* at 306.  The plaintiff in *Southern National* argued its "presence as a 'small player in a very, very large and liquid market' obviated the need for [its expert] to account for competition in his lost profits calculation."  *Id.* at 305 n.11.  The court rejected the argument, stating "plaintiffs [had] offered no evidence to support this theory, and the court does not credit it, either as a matter of fact or of common sense."  *Id.*  At oral argument, when asked to differentiate the immediate case from *Southern National*, plaintiff again fell back on its lay witness's experience rather than any expert analysis:

THE COURT:  Doesn't that sound like your chart?

[PLAINTIFF]:  No, not at all.

THE COURT:  We'll license the technology and create these sensors that have never been done before and all of a sudden our sales are going to skyrocket, look at this chart?

[PLAINTIFF]:  Because we know that our customers, the customers don't care.  All they care about is performance and price.

Tr. at 114:9–19.  Without admissible testimony in the record, however, the Court cannot determine as a matter of law plaintiff's model adequately accounts for competition.  Plaintiff admitted its lay witness did not assess market data or economic data to make such a determination, arguing only its lay witness was "full of market data":

THE COURT:  But didn't Mr. Keller agree that he did not seek out market data or economic data for the silicon carbide sales?

[PLAINTIFF]:  He's full of market data.  He didn't need to—yes, that's what a paid expert like the one hired by the [g]overnment would do, is they go to the business school and they go into the library and they look through a pile of stuff and say—

THE COURT:  Isn't that the standard the Court has to follow?  Isn't that what the law is?

- 23 -

[PLAINTIFF]:  No.

THE COURT:   Experts that are properly qualified and utilize proper data and methodology?

[PLAINTIFF]:  If they're an expert within the meaning of Rule 702 and 703.

THE COURT: So the Court should just track the company employees who say that their sales will skyrocket without any basis?

[PLAINTIFF]:  Well, your Honor, I think that's a question of fact that I think involves fact finding.  I don't think it's very amenable to a decision on briefs.

Tr. at [114:20–115:24; 25 Mar. 2022 Oral Arg. Tr. at 111:4–9 ("[GOVERNMENT:]  It certainly would be a wonderful rule of evidence for a sales person to be able to come to a Federal Court and say, '[A]ll my clients say they would have paid me an enormous amount of money, so we'll just take that in damages,' but that's not how proving a case works."), ECF No. 132.  In contrast to plaintiff's assertion, however, whether a witness's testimony is "rationally based on [his] perception" is a question of law governed by the Federal Rules of Evidence.  FED. R. EVID. 701(a) ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . rationally based on the witness's perception.").  Under this authority, the Court's Exclusion Order noted plaintiff's sales projections "are not based on or even congruent with its historical sales" and excluded plaintiff's sales projections "[t]o the extent Mr. Keller's and Mr. Carollo's opinions regarding future sales depart from Spectre's past performance [and accordingly] cannot be rationally based on their perception."  *Spectre*, 160 Fed. Cl. at 501 (citing FED. R. EVID. 701(a)).  Plaintiff has again failed to provide any evidence countering the government's position on the effect of the Exclusion Order.  Without additional support, plaintiff cannot point to any evidence supporting its projected revenue in a but-for world.[4]  *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the [plaintiff's] damages."); *S. Nuclear*, 637 F.3d at 1304.  As plaintiff has failed to establish both avoided costs and projected revenue, it accordingly cannot establish causation under the second prong of the lost profits test and the government is entitled to partial judgment as a matter of law.

---

[4] Plaintiff further contends in its Response:  "Although the court obviously devoted substantial effort to drafting its decision, there is nothing in the decision to suggest that the court read or considered Dr. Spangler's declaration, ECF 121-1, or Mr. Keller's declaration, ECF 122."  Resp. at 5.  At oral argument, plaintiff acknowledged the Court cited to Dr. Spangler's declaration:  "[THE COURT:]  Your briefing, [plaintiff], notes in a couple instances that the Court did not consider Dr. Spangler's declaration or Mr. Keller's declaration.  The Court did cite them, correct? [PLAINTIFF]:  Did you?  I'm sorry.  I apologize.  THE COURT:  . . . I think pages 4 through 5 were Spangler's declaration. . . .  Is that quoting Dr. Spangler there?  [PLAINTIFF]:  Oh, I see.  Spangler declaration.  Yeah, I've got it.  Yes.  Okay."  Tr. at 49:11–50:6; *see also Spectre Corp. v. United States*, 160 Fed. Cl. 486, 491 (2022).  When asked whether these declarations included any arguments not addressed in the Court's Exclusion Order, plaintiff could not identify any.  Tr. at 52:11–20 ("THE COURT:  Just to confirm, though, did the declarations include any arguments which the Court did not address?  [PLAINTIFF]:  I'd have to go back and look, your Honor.  I thought we submitted a second declaration by Spangler in which he explained that.  I mean his deposition testimony was not very good.  I admit that.").

*Anchor Sav. Bank*, 597 F.3d at 1361; *Yankee Atomic*, 563 F.3d at 1273; *S. Nuclear*, 637 F.3d at 1304.

## VII.   Lost Profits Test, Prong Three:  Whether Spectre Can Establish Reasonably Certain Lost Profits

The government alleges, for similar reasons as the "causation" prong, plaintiff cannot establish the third prong of the lost profits test:  "the amount of the lost profits . . . established with reasonable certainty."  *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010).  The government's Motion does not provide any additional arguments for reasonable certainty, instead indicating "Spectre's failure to provide proof of essential elements of its [causation] but-for world also renders its lost profits model hopelessly uncertain [under the third prong]."  Gov't Am. MPSJ at 32.  At oral argument, both parties agreed their arguments for reasonable certainty under prong three are equivalent to those for causation under prong two.  Tr. at 118:16–19 (the government confirming); Tr. at 119:11–120:19 (plaintiff confirming).  As a matter of law, plaintiff is unable to establish causation under prong two with the admissible evidence in the record and for analogous reasons is unable to establish reasonable certainty under prong three.  *See supra* Section VI; *see also* Tr. at 35:5–7 ("[PLAINTIFF:]  I don't agree with your Honor's ruling on those motions, but I do agree that it does knock out the lost profits case.").  Plaintiff is accordingly unable to support its lost profits model, as it cannot establish *both* avoided costs *and* projected revenue—and the government is accordingly entitled to partial judgment as a matter of law.  *Anchor Sav. Bank, FSB*, 597 F.3d at 1361; *Yankee Atomic*, 563 F.3d at 1273; *S. Nuclear Op. Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011); *S. Nat. Corp. v. United States*, 57 Fed. Cl. 294, 305 (2003) (citing *Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223, 241–42 (2003)).

## VIII.   Even if the Court Were to Consider Plaintiff's Evidence, Whether the Evidence Amounts to Mere Theoretical Speculations

Despite plaintiff's failure to provide evidence establishing lost profits as a matter of law, the Court briefly turns to the inadmissible evidence in the record to determine whether plaintiff could nevertheless establish lost profits if the projections and testimony from its excluded witnesses were admissible.  For plaintiff's evidence to support a claim for lost profits, "the factual predicate of any expert's opinion must find support in the record and . . . 'mere "theoretical speculations" lacking a basis in the record will not create genuine issue of fact.'"  *Standard Fed. Bank v. United States*, 62 Fed. Cl. 265, 288 (2004) (quoting *Novartis Corp v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001)).  Mere "conclusory testimony of an expert does not meet plaintiff's evidentiary burden."  *Id.*  Plaintiff agreed with this statement from *Standard Federal Bank* at oral argument, though counsel disagreed on the case's applicability here.  According to plaintiff, on the evidentiary burden, it is "a question of fact that the trier of fact has to decide whether the evidence presented is reliable enough and is sufficient enough to have some reasonable certainty as to the quantum of damages."  Tr. at 14:11–15:3.  While plaintiff is correct *weighing* the evidence is a question for the trier of fact, it is a question of law whether plaintiff's evidence amounts to "mere 'theoretical speculations' lacking a basis in the record," as such speculations cannot "create a genuine issue of fact."  *Standard Fed. Bank*, 62 Fed. Cl. at 288.

In assessing whether plaintiff's evidence amounts to "mere 'theoretical speculations' lacking basis in the record," *id.*, the Court must determine whether "proof that is flawed merely as to the amount of damages . . . [nevertheless establishes] proximity of cause and result." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223, 242 (2003). Plaintiff agreed with this guidance from *Fifth Third*, agreeing plaintiff "need[s] [to prove] more than just projected values of revenue; we need to have evidence of causation and reasonably certain profits." Tr. at 16:3–17. To the extent plaintiff's evidence was admissible, it must therefore still not be "mere 'theoretical speculations' lacking basis in the record," *Standard Fed. Bank*, 62 Fed. Cl. at 288, and establish "proximity of cause and result," *Fifth Third*, 55 Fed. Cl. at 242. The record at this point is sufficient to determine whether, as a matter of law, plaintiff's lost profits model is speculative as a matter of law. At oral argument, plaintiff did not note any other evidence or projections which could aid the Court in understanding its case for lost profits. Tr. at 120:20–121:20. The government confirmed its depositions are complete. Tr. at 122:8–18. The Court accordingly turns to all evidence in the record to confirm whether even if the evidence were admissible it could support a claim for causation and reasonably certain lost profits. *Fifth Third*, 55 Fed. Cl. at 242.

### A.   Whether Plaintiff's Inadmissible Evidence Could Establish Avoided Costs Under the Causation Prong of the Lost Profits Test

As discussed *supra* Sections V, VI, in order to prove causation under the *Anchor Savings Bank* lost profits test, plaintiff must first establish its avoided costs in a but-for world without the alleged breach. *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010); *Yankee Atomic Elec. Co. v. United States,* 536 F.3d 1268, 1273 (Fed. Cir. 2008) ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the Yankees' damages"); *S. Nuclear Op. Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011). Plaintiff's evidence for avoided costs currently in the record relies on manufacturing cost projections compiled by Mr. Votypka and derived from Dr. Melkonian's projections. *See* Gov't's Am. MPSJ App. at 13–20 (Pl.'s Costs Model) (providing manufacturing cost estimates for fiscal years between 2012 and 2018). Plaintiff's brief provides no explanation for how these values were derived or based in anything other than the nebulous concept of "experience." For example, in plaintiff's projections for manufacturing costs in Fiscal Year 2023, plaintiff projects a unit cost per die at $24.25. *Id.* at 15. In Section VI, *supra*, the Court determined the die cost values were based on excluded testimony. Beyond admissibility, however, this value also has no factual support in the record. *Standard Fed. Bank*, 62 Fed. Cl. at 288. At oral argument, though asked repeatedly, plaintiff could not identify the factual basis for its die cost projection. Tr. at 62:17–63:7 ("[THE COURT:] So how did he come up with $24? . . . Where is the factual foundation for the $24 [under *Standard Federal Bank*]? [PLAINTIFF]: Well, that was the number of dies at a certain yield rate. We assumed— THE COURT: From an invoice that was received? [PLAINTIFF]: No. There was no invoice. I retained Dr. Melkonian . . . [a]nd I needed the numbers and he sent me this work stuff."); Tr. at 63:13–18 ("THE COURT: I'm just wondering where the $24 is supported now . . . . [PLAINTIFF]: It was Spangler's estimate but assuming a certain yield rate . . . ."); Tr. at 64:7–10 ("[THE COURT:] [W]hy is it [$]24, not [$]30? [PLAINTIFF]:

Because it was that number divided by the number of dies . . ."); Tr. at 71:5–16 ("[THE COURT:]  [I]f you had to point to the hard evidence that supports the factual foundation of the numbers here, what elements, what evidence, what paperwork supports the dollar values in the spreadsheet?  Or is it just all opinion from Mr. Votypka?  [PLAINTIFF]:  No, it wasn't Mr. Votypka's opinion.  For that particular item, it was Melkonian as adjusted by Spangler, and that number was given to Votypka.").[5]  Plaintiff's failure to identify any factual basis in the record for its die costs is fatal to establishing its cost estimates as anything other than "mere 'theoretical speculations' lacking a basis in the record."  *Standard Fed. Bank*, 62 Fed. Cl. at 288.  Even if plaintiff's projections were admissible, plaintiff has not shown how the die costs values are supported by anything other than merely a lay witness's unfounded guess at the actual cost. Such speculative values are "conclusory testimony . . . [which] does not meet plaintiff's evidentiary burden."  *Id.* at 288; *Fifth Third*, 55 Fed. Cl. at 242 (requiring the evidence to establish "proximity of cause and result").

In addition, plaintiff's packaging cost estimates must provide more than factual speculation in establishing avoided costs.  *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010); *Standard Fed. Bank*, 62 Fed. Cl. at 288.  The same cost projection spreadsheets list various materials required in the sensor packaging.  *See* Gov't's Am. MPSJ App. at 13–20 (Pl.'s Costs Model); *see also* Tr. at 73:12–21 ("THE COURT:  What's the total package cost?  [THE GOVERNMENT]:  For the total package, you can see that highlighted in row 3 . . . through 5 I believe I have highlighted numbers.  THE COURT:  Those are all packaging?  [THE GOVERNMENT]:  That's my understanding from Dr. Votypka's testimony.").  These spreadsheets note various materials Spectre intended to purchase for the packaging, including a SiC wafer, alumina nitride, and kovar for the housing.  *See* Gov't's Am. MPSJ App. at 15 (Pl.'s Costs Model) (projecting costs for 2013).  At oral argument, however, plaintiff confirmed the values in this spreadsheet were purely based on Mr. Votypka's experience working at Spectre and other businesses.  Tr. at 75:14–76:5 ("THE COURT:  The deposition transcript of Mr. Votypka mentions a couple things like attach to header, glass frits, nickel powder.  Each of those has value on the spreadsheet.  Where did those come from so we understand those steps?  [PLAINTIFF]:  Well, you see glass frits right there.  He obtained—he called people and obtained material pricing or got it from catalogs of materials.  And the hours of labor were based on his experience and working at Spectre and other businesses.  THE COURT: So just numbers based on his experience?  [PLAINTIFF]:  Yes.").  Plaintiff attempted to argue these values were not based on conclusory testimony because they were "based on experience

---

[5] Dr. Melkonian was initially identified as plaintiff's expert witness to "offer testimony about the estimated commercial cost to fabricate silicon carbide pressure sensors" but withdrew due to "an unanticipated conflict of interest," leaving plaintiff with "an incomplete fabrication cost estimate and no expert witness to testify."  *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 489 (2022).  Plaintiff retained a new expert, Dr. Spangler, but to avoid "duplicating costs," plaintiff had Dr. Spangler review Dr. Melkonian's "work on fabrication cost estimates."  *Id.*  Dr. Spangler "reviewed Dr. Melkonian's partial cost estimate, made some changes, and endorsed it" as his own.  *Id.*  Dr. Spangler's cost estimates, however, were "limited to the cost to fabricate the silicon carbide die, or internal components of the silicon carbide pressure sensor."  *Id.*  Plaintiff therefore had its project manager and engineer, Mr. Votypka, "prepare[] an estimate of the labor and materials necessary to calculate the cost of carrying out the packaging process as he understood it."  *Id.* at 490.  "Together, Mr. Votypka's packaging cost estimate and Dr. Spangler's fabrication cost estimate comprised the total cost to manufacture the silicon carbide pressure sensors."  *Id.*

and [] based on actual pricing." Tr. at 76:6–25.  As an example, plaintiff stated he and his witness "went back and checked the price of gold back at the time, because gold fluctuated quite a bit at the time, in order to get a historical price for it." *Id.*  Although some of the values may be based on "historical price[s]," there is nothing in the record indicating how plaintiff's witnesses arrived at this value; and mere "experience" is not sufficient to support avoided costs.  *See Standard Fed. Bank*, 62 Fed. Cl. at 288 (finding evidence for lost profits deficient when it is merely "conclusory testimony . . . [and therefore] does not meet plaintiff's evidentiary burden").  Like plaintiff's evidence for die cost, plaintiff's evidence for projected packaging costs is lacking in factual support and therefore provides "mere 'theoretical speculations' lacking a basis in the record."  *Standard Fed. Bank*, 62 Fed. Cl. at 288.

### B.     Whether Plaintiff's Inadmissible Evidence Could Establish Projected Revenue Under the Causation Prong of the Lost Profits Test

As discussed *supra* Sections V, VI, in order to prove lost profits, plaintiff must also establish projected revenue.  *Yankee Atomic*, 536 F.3d at 1273 ("Without record evidence about the [plaintiff's] condition with full [g]overnment performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the Yankees' damages"); *S. Nuclear*, 637 F.3d at 1304.  Plaintiff contends its sales projections are "rationally based on its years of experience in the pressure sensor market."  Pl.'s Resp. at 10.  Although Spectre's salespeople may be highly qualified—as plaintiffs contend in their briefs—this status alone is not enough when the testimony is "conclusory" or "mere 'theoretical speculations' lacking a basis in the record."  *See Standard Fed. Bank*, 62 Fed. Cl. at 288 (quoting *Novartis Corp.*, 271 F.3d at 1051) (finding evidence for lost profits deficient when it is merely "conclusory testimony . . . [and therefore] does not meet plaintiff's evidentiary burden").  The testimony must also provide some analysis connecting the documents in the record to a plausible projection of future revenue.  *Id.*  Plaintiff's projections in this case are largely based on assumptions from lay witnesses.  *See* Gov't's Am. MPSJ App. at 8–9 (Plaintiff's Second Interrogs. Answers) (stating "[p]lease note that for fiscal years 2016 through 2018, Spectre has assumed approximately half of all sales would be digital transducers and half analog transducers and that sales would stabilize between an annual low figure of 9,000 units and a High of 11,000" with no support for the assumption); *id.* at 9 ("Limiting sales in such a way not only keeps Spectre's projections conservative, but allows for simpler modeling because it permits Spectre to fill projected demand without substantial expansion of its workforce or plant"); *id.* at 10 ("A final possibility is that a larger manufacturer would take notice of the same potential and offer to buy Spectre at a premium that would reflect successful commercialization of the NASA patents and future sales remaining during the patent period.  Based on the income capitalization approach to rough valuation of a company, the sales reasonably projected would result in a sales price of at least $35,000,000 to $40,000,000.").  At oral argument, plaintiff argued its sales projections were not "conclusory" in the same manner as those in *Standard Federal Bank* because the projections were based on the "experience" of its salesmen.  Tr. at 98:24–99:16 ("THE COURT:  What does [Mr. Keller] testify to in order to indicate that, or is it just is his experience?  [PLAINTIFF]:  That this technology provided a sensor that would go to a higher temperature, could be exposed to harsher environments, including radioactivity, than anything else on the market, and that because of the production costs that . . . they could undersell any competitor, any of the people who were currently

providing things for higher temperatures in the market.  THE COURT:  But that was just Mr. Keller's opinion based on experience?  [PLAINTIFF]:  Yes.  I mean and he can give you examples of that.").  Plaintiff admitted, however, the testimony was not based on documentation from company sales or purchase orders but instead the salesmen's "knowledge of the use of these companies of pressure sensors."  Tr. at 100:1–101:11 ("THE COURT:  Well, if we just looked at what Mr. Keller's spreadsheets had with respect to, say, manufacturers that would purchase them, like Foxboro, Emerson, Rolls-Royce, how is it that Mr. Keller came up with the quantities that they would purchase?  What data was that based on?  [PLAINTIFF]:  It was based on knowledge of the use of these companies of pressure sensors.  THE COURT:  So he had looked at the company sales of certain items that would need them?  [PLAINTIFF]:  Well, no.  They typically talk to in-house engineers or in-house purchasing agents about the needs of the company.  THE COURT:  So he had documentation related to company purchasing quantities?  [PLAINTIFF]:  Well, he didn't . . . have any purchase orders or anything, your Honor.  At the time they had a customer list of around 800 customers.  And one of the things that they did was they . . . paid GlobalSpec to come up with a list of potential customers.  And there may have been some overlap there.  I don't know.  But GlobalSpec provided about 1,500 prospects.  And they called all of those people and told them, this is what we're working on, this is what we can offer.  What are your needs?  As well as many of their existing customers.  But they never got anything in.").  This "knowledge" of pressure sensors cannot support a model for projected revenue when the testimony is "conclusory" and a "mere 'theoretical speculation[],'" *Standard Fed. Bank*, 62 Fed. Cl. at 288 (quoting *Novartis*, 271 F.3d at 1051).  As an illustration of the deficiency of plaintiff's projections, when asked about exemplary values in their spreadsheets, plaintiff could not provide any factual basis for these projections.[6]  Tr. at 101:18–102:2 ("THE COURT:  Just looking at this, Rolls-Royce is listed as purchasing 200 of these at [$]1,500 a pop.  Where did that 200 come from?  [PLAINTIFF]:  I'm not sure why he said 200.  THE COURT:  Is there anything in the record about why he said 200?  [PLAINTIFF]:  I don't know.  I don't recall.").  Providing opinion alone, including projecting a full market saturation based on an undelivered prototype product, cannot reasonably create an issue of disputed fact.  *Standard Fed. Bank*, 62 Fed. Cl. at 288.  Plaintiff's evidence then—even if it were admissible—is not reasonably certain, because it requires the Court to accept "the factual predicate" of plaintiff's expert opinion, which is unsupported.  *Id.*; *Fifth Third*, 55 Fed. Cl. at 242.

Plaintiff's sales projections are also inconsistent with its historical experience, as noted *supra* Section VI, which similarly raises a deficiency issue under *Standard Federal Bank*.  At oral argument, plaintiff agreed Spectre had not made high-temperature products in the past.  Tr. at 91:6–8 ("[THE COURT:] [H]as Spectre made high-temperature products in the past?  [PLAINTIFF]:  No.").  While lack of experience alone may not render sales projections deficient, the lack of experience in this case is reflected in sales projections which do not depart from mere speculation.  For example, when the Court asked plaintiff why its sales projections for 2013 were approximately two million dollars rather than 12 million, plaintiff responded:

---

[6] In at least one instance, Spectre's projections did not even seem to make sense to counsel:  Tr. at 84:13–85:9 ("[THE COURT:]  [H]ow did Spectre arrive at the unit costs then? . . .  [PLAINTIFF:]  One of the things I asked was, Mr. Carollo had a really low price with one of his customers.  And I said 'Why would we?'  And he said, 'Well, they don't need high temperature so they would not pay a big premium for it.' . . .  I said . . . 'Why would we sell it to them instead of selling it to somebody else?'  So that's the approach that was taken.").

> Because we decided to simplify the lost profits model. . . .   [B]ut we never had anything to show [potential customers] that could be demonstrated because what we were sent was stuff that was not actually designed and made for us.  And so . . . when we thought about this originally, to actually do the but-for world, it would have been a much more complicated lost profits model because it would have involved bringing in investors, expanding the plant, buying more equipment, and that was going to be very, very complicated.  So I guess you could call this unreasonable, but 'unreasonable' usually means bigger.  This was unreasonable and we made it smaller.

Tr. at 86:17–87:21.  Plaintiff's admittedly "unreasonable" projections, however, could not satisfy its burden at trial to establish the factual basis for its projections.  *Standard Fed. Bank*, 62 Fed. Cl. at 288.  As noted *supra* Section IV.B, plaintiff recognized the need for further support at oral argument:

> [THE COURT:]  [D]idn't Mr. Keller agree that he did not seek out market data or economic data for the silicon carbide sales?
>
> [PLAINTIFF]:  He's full of market data.  He didn't need to—yes, that's what a paid expert like the one hired by the [g]overnment would do, is they go to the business school and they go into the library and they look through a pile of stuff . . . .

Tr. at 114:20–115:4.  Plaintiff further characterized portions of Mr. Carollo's deposition, stating:

> [Mr. Carollo] didn't go to the business school and look up anything to see what the pressure sensor market is because he knows the pressure sensor market.  He's been servicing hundreds of customers for three decades, and he doesn't have to go to the business school and look at a magazine to tell him what the pressure sensor market is.

Tr. at 118:1–8.  The deficiencies with plaintiff's sales projections similarly align with plaintiff's failure to provide an explanation why others have not capitalized on the technology despite the now-expired patents.  Tr. at 107:13–24 ("THE COURT: Like we talked about from the beginning, the patents are no longer being protected, they've expired.  Why is it that someone hasn't picked up on them and made millions?  [PLAINTIFF]:  I don't know, your Honor."); *see supra* Section VI.B.  This lack of factual support, as confirmed by plaintiff in its briefing and at oral argument, renders plaintiff's sales projections ungrounded in anything which could support a lost profits model.[7]  Without more, plaintiff could not establish a material dispute of fact to

---

[7] At oral argument, plaintiff stated its grant proposal to the State of Ohio "had a business plan . . . as to how the three million dollars was going to be spent . . . and ramping it up to 25 million in sales over five years."  Tr. at 103:22–104:3.  Plaintiff first raised this contention at argument on the motions in limine.  *See Spectre Corp.*, 160 Fed. Cl. at 503 n.6 (2022).  The Court noted in its Exclusion Order "[t]he government acknowledges reviewing the business proposal but refers to a letter it argues disclaims any endorsement of the business conclusions in the proposal."  *Id.* (citations omitted).  Plaintiff correctly notes the business proposal projects sales revenue of $25 million.  Compl. Ex. 4 at 20.  This revenue projection suffers from the same deficiencies as its other sales projections, however, including the fact the description of the sales provides no factual basis for this estimate.  The proposal states:  "Our growth in

support a claim for lost profits. *Standard Fed. Bank*, 62 Fed. Cl. at 288; *Fifth Third*, 55 Fed. Cl. at 242.

Lastly, at oral argument, the Court asked the parties whether "there are any other documents or depositions not in the record which would aid the Court in determining lost profits." Tr. at 120:20–24. Plaintiff did not cite any additional materials in the record. Tr. at 121:4–16. The government confirmed its depositions were complete, contending nothing would prevent the Court from determining lost profits as a matter of law. Tr. at 122:11–25. The Court has reviewed the existing record and finds the evidence provided by both parties could not support a material dispute of fact over avoided costs and projected revenue, even were the evidence to be admissible. *See supra*. The Court accordingly finds, were the evidence to be admissible, plaintiff still could not support a claim for lost profits. *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010); *Yankee Atomic*, 536 F.3d at 1273; *S. Nuclear Op. Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011); *S. Nat. Corp. v. United States*, 57 Fed. Cl. 294, 305 (2003) (citing *Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223, 241–42 (2003)); *Standard Fed. Bank*, 62 Fed. Cl. at 288; *Fifth Third*, 55 Fed. Cl. at 242.

## IX.    Conclusion

For the foregoing reasons, the Court accordingly **GRANTS** the government's Amended Motion for Partial Summary Judgment on plaintiff's claims for lost profits damages, ECF No. 146, and **FINDS as MOOT** the government's original Motion for Partial Summary Judgment, ECF No. 115. The Court dismisses plaintiff's request for any lost profits damages, as included in counts III and IV. The parties shall confer and **SHALL FILE** a joint status report **on or before 16 August 2024** detailing the remaining issues in the case and proposing a schedule for further proceedings.

**IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge

---

sales over the next three years is solely limited by our production capacity," *id.*; "Identifying new distributors to expand our sales is an easy process. . . . Once [prospective customers] speak to our other distributors that have continually made money selling our products they always ask to represent us." *Id.* Plaintiff did not explain how this projected value of precisely $25 million over five years—citing similar allegations of unlimited demand—is supported by the factual bases necessary to establish a lost profits model. This proposal therefore does not change the Court's finding on plaintiff's failure to show an issue of material fact. *Standard Fed. Bank v. United States*, 62 Fed. Cl. 265, 288 (2004).