# In the United States Court of Federal Claims

No. 16-932
(Filed:  18 August 2025)

```
*****************************************
SPECTRE CORPORATION,                    *
                                        *
              Plaintiff,                *
                                        *
v.                                      *
                                        *
THE UNITED STATES,                      *
                                        *
              Defendant.                *
                                        *
*****************************************
```

*James W. Wiggin III*, of Columbus, OH, for plaintiff.

*Nelson Kuan*, Trial Attorney, Commercial Litigation Branch, Civil Division, of the US Department of Justice, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Assistant Director, *Martin F. Hockey, Jr.*, Deputy Director, all of Washington, DC, for the government.

## <u>OPINION AND ORDER</u>

**HOLTE, Judge.**

Plaintiff Spectre Corporation manufactures and sells pressure sensors to be used across various industries, including automotive, oil and gas, aviation, and aerospace.  Spectre and NASA executed two contracts to license and commercialize NASA's patented silicon carbide pressure sensor technology—a Patent License and Space Act Agreement.  Plaintiff alleges NASA breached both contracts as well as the implied duty of good faith and fair dealing, seeking compensatory damages and lost profits.  On 17 July 2024, the Court dismissed plaintiff's request for any lost profits damages.  The parties subsequently filed cross-motions for summary judgment on the government's alleged breaches.  For the following reasons, the Court grants the government's Motion for Summary Judgment and denies plaintiff's Cross-Motion.

## I.    Factual History[1]

---

[1] All facts in this section are undisputed, unless stated otherwise.  *See* RCFC 56(a) (requiring a movant for summary judgment to demonstrate "there is no genuine dispute as to any material fact").  The Court draws all inferences "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Plaintiff Spectre Corporation and the United States through NASA executed two agreements to commercialize pressure sensor technology NASA developed and patented. The first agreement, SAA3-210 ("Space Act Agreement") executed on 22 December 2011, sets forth NASA's and Spectre's obligations to commercialize NASA's silicon-carbide sensor technology. *See* Compl. Ex. 2 at 5–21 (Space Act Agreement), ECF No. 1-3. The second agreement, DE-456 ("Exclusive License Agreement") executed on 14 May 2012, granted Spectre a royalty-bearing, exclusive license to practice the silicon-carbide sensor patents through 25 January 2025, the end of the patents' terms, and required Spectre to pay a $50,000 fee to NASA. *See* Compl. Ex. 1 at 1–31 (Exclusive License Agreement), ECF Nos. 1-1, 1-2, 1-3. Around the same time, Spectre applied for and received a $1,000,000 grant from the State of Ohio to commercialize the sensor technology. *See* Compl. Ex. 3 at 23–84 (Ohio Grant), ECF No. 1-3.

The Space Act Agreement ("SAA") consists of eleven "Milestones" governing the parties' responsibilities:

1. NASA completes Pressure Sensing Element Design
2. NASA completes Wafer Fabrication
3. NASA completes Sensing Element Test
4. NASA completes Header Fabrication and Assembly
5. NASA completes Pressure Sensing Module Functional Test
6. NASA delivers Fabrication Run 1 Sensors to Spectre
7. NASA completes Integration in Spectre Sensor Package
8. Spectre Corp. completes Cold Performance Test
9. Spectre Corp. completes Commercial Evaluation
10. Spectre Corp. and NASA complete Review of Design, Integration and Performance
11. NASA completes Fabrication Run 2 and deliver sensors to Spectre

Compl. Ex. 2 at 5 (Space Act Agreement). The SAA also requires "Spectre . . . to pay NASA [Glenn Research Center ("GRC")] $100,000.00 prior to initiation of work under this agreement, and . . . $80,000.00 prior to the start of Milestone No. 3." *Id.* at 6. After delays and conflicts affecting the performance of obligations under the contracts, including Spectre not completing its payment requirements prior to the start of Milestone No. 3, NASA terminated the Exclusive Licensing Agreement and halted its performance under the Space Act Agreement, allowing the Space Act Agreement to expire by its own terms. Compl. at 4, ECF No. 1. Plaintiff brought this action for breach of the Space Act Agreement and the Exclusive Licensing Agreement claiming $215,000 for fees paid to NASA, at least $2,000,000 for money spent on the failed project, and more than $45,000,000 in lost profits. *See* Compl. at 43.

## II.    Procedural History

On 26 July 2022, the Court granted the government's Motion in Limine to exclude plaintiff's fact report on packaging cost information, portions of its expert report on fabrication cost information, and portions of its fact report on sales projections. *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 505 (2022). The Court subsequently granted plaintiff an opportunity to "prepare and submit a revised report" for each of the three reports based on "admissible

evidence," *see id.*, and adopted the parties' proposed schedule setting a 31 October 2022 deadline to submit the revised reports. *See* 26 Aug. 2022 Order at 1, ECF No. 135. Plaintiff missed the deadline, *see* Gov't's Opp'n to Spectre's Out of Time Mot. for an Enlargement of Time ("Gov't EOT Resp.") at 2, ECF No. 137, and instead—one month after the deadline— filed a motion for enlargement of time, ECF No. 136. The Court denied plaintiff's motion for enlargement of time, concluding plaintiff's "failure to meet the 31 October 2022 deadline accordingly does not amount to excusable neglect, so a motion for enlargement of time cannot cure plaintiff's failure." *Spectre Corp. v. United States*, 165 Fed. Cl. 563, 575 (2023) (first citing RCFC 6(b)(1)(B); and then citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). As a result, plaintiff had "little evidence to replace the excluded fact report on packaging costs information, portions of the expert report on fabrication cost information, and portions of the fact report on sales projections." *See Spectre Corp. v. United States*, 172 Fed. Cl. 159, 162 (2024).

Following the Court's order granting the government's Motions in Limine, on 20 June 2023, the government filed an amended motion for partial summary judgment on lost profits. Gov't Am. Mot. for Partial Summ. J. ("Gov't Am. MPSJ"), ECF No. 146. The Court held oral argument on 21 March 2024 in Akron, Ohio. *See* 7 Dec. 2023 Scheduling Order, ECF No. 150. On 17 July 2024, the Court granted the government's Amended Motion for Partial Summary Judgment on plaintiff's claims for lost profits damages, found as moot the government's original Motion for Partial Summary Judgment, and dismissed plaintiff's request for any lost profits damages, as included in counts III and IV. *See Spectre*, 172 Fed. Cl. at 186. On 12 August 2024, the parties submitted a joint status report "detailing the remaining issues in the case and proposing a schedule for further proceedings." *See* 12 Aug. 2024 JSR at 2, ECF No. 155. In the JSR, the parties discussed the possibility of either holding a mini-trial on liability or resolving dispositive issues by way of summary judgment motions. *See id.* at 3, 6. The government also sought the Court to "amend its decision granting [the government]'s motion for partial summary judgment for lost profits damages to include Counts I and II of the Complaint, in addition to Counts III and IV as the decision currently provides" because the Court's "reasoning nevertheless applies equally to all four counts because plaintiff's purported evidence subject to the *in limine* rulings was not specific to distinct counts of the complaint." *Id.* at 6–7. The government explained the "requested amendment [was] only clerical in nature." *Id.* at 7.

The Court then held a substantive status conference on 25 September 2024 to discuss next steps in the case and a schedule moving forward. *See* 9 Sept. 2024 Scheduling Order, ECF No. 156. At the status conference, the parties agreed to a briefing schedule on cross-motions for summary judgment on liability and the Court adopted the parties' schedule. *See* 25 Sept. Scheduling Order and Formal Clarification, ECF No. 157. During the status conference, "the Court also discussed with the parties the government's request for the Court to amend its 17 July 2024 Opinion and Order, *Spectre Corp. v. United States*, 172 Fed. Cl. 159 (2024), granting the government's Motion for partial Summary Judgment for Lost Profits Damages to include Counts I and II of the Complaint, in addition to Counts III and IV as the decision currently provides." *Id.* at 1 (citing 12 Aug. 2024 JSR). "All parties agree[d] the Court's decision on lost profits should apply to all Counts and not just Counts III and IV," so the Court "formally clarifie[d] its 17 July 2024 Opinion and Order dispose[d] of all of plaintiff's lost profits claims in this case." *Id.*

The parties, then, both moved for summary judgment on the issue of liability. The government filed its opening Motion for Summary Judgment on 25 October 2024. *See* Gov't Mot. for Summ. J. ("Gov't's MSJ"), ECF No. 158. Plaintiff filed its Cross-Motion for Summary Judgment and Response on 2 December 2024. *See* Pl.'s Cross-Mot. for Summ. J. and Resp. ("Pl.'s CMSJ"), ECF No. 162. The government filed its Reply to plaintiff's Cross-Motion for Summary Judgment and Response in Support of its Motion for Summary Judgment on 6 January 2025. *See* Gov't's Reply to Pl.'s CMSJ ("Gov't's Reply"), ECF No. 163. Plaintiff filed its Reply in Support of its Cross-Motion for Summary Judgment on 21 January 2025. *See* Pl.'s Reply in Support of Pl.'s CMSJ ("Pl.'s Reply"), ECF No. 164. The Court held oral argument on the parties' Cross-Motions for Summary Judgment on 3 April 2025 in Akron, Ohio. *See* 7 Feb. 2025 Order, ECF No 165.

## III.    Parties Arguments

The Court begins by summarizing the parties' arguments regarding the alleged breach of the Space Act Agreement ("SAA") and the Patent License and then summarizes the parties' arguments regarding the alleged breach of the implied duty of good faith and fair dealing for both.

### A.    Parties' Arguments Regarding the Alleged Breach of the Space Act Agreement

The government, in its motion for summary judgment, argues it did not breach the SAA because it satisfactorily performed all duties under Milestones 1 and 2 and did not need to perform past Milestone 2 due to plaintiff failing to complete its payment prior to Milestone 3. The government argues the "SAA explicitly and repeatedly required Spectre to pay in advance of NASA's efforts under the SAA." Gov't's MSJ at 14 (citing App'x at 6). Specifically, the government argues Spectre "was required to pay NASA at least the initial $100,000 payment and the first $80,000 milestone payment for a total of $180,000 'prior to the start of Milestone 3,'" but plaintiff "never paid the remaining $15,000 out of the first $80,000 milestone payment." *Id.* (first quoting App'x at 6; then quoting App'x at 90–91). As plaintiff never completed the milestone payment, the government argues NASA was prevented from further performance under the SAA and therefore could not have breached the SAA. *Id.* at 14, 22–23. The government argues because plaintiff "fail[ed] to complete the $80,000 milestone payment required prior to the start of Milestone 3 . . . , NASA never had any obligation to go beyond completing Milestones 1 and 2." *Id.* at 16.

The government further argues plaintiff cannot carry its burden to prove NASA breached the SAA in its performance of Milestones 1 and 2. *See* Gov't's MSJ at 15. The government argues "NASA's performance for Milestones 1 and 2 occurred entirely within NASA pursuant to the terms of the SAA." *Id.* (citing App'x at 3–4). The government further argues plaintiffs alleged breaches fail for three reasons: (1) NASA never reached the Milestone requiring delivery, so NASA never had an obligation to deliver anything to Spectre; (2) NASA designed the dies and wafer for Spectre under the SAA and Spectre did not present evidence to the

contrary; and (3) the "SAA provided only estimated time frames for the milestones" and were not strict deadlines." *Id.* at 16–18.

In response, Spectre argues while "the payment provisions cannot be gainsaid," it "raises the question of whether NASA had actually met the Milestone and earned the moneys previously 'reimbursed' in advance." Pl.'s CMSJ at 12. Spectre claims, "NASA did not accomplish Milestone 1 or 2 and was not entitled to be paid for in advance of Milestone 3 and 8" because "NASA has presented no facts to establish that wafer DH0852-15 was actually designed and fabricated for Spectre" and there is "much evidence to suggest it was not." *Id.* at 12–14 (citing Votypka Decl. ¶¶ 25–33). Specifically, plaintiff argues its "demonstrative exhibits regarding DH08512-15 and Mr. Votypka's observations" establish "the DH08512-15 wafer was not purchased for the project" because "there is nothing in the traveler to tie the fabrication of this wafer to Spectre's project." Pl.'s Reply at 7. Plaintiff asserts the government should have provided testimony from Dr. Okojie explaining NASA performed the design and fabrication work for Spectre. *Id.* at 6. Spectre also argues while "it cannot be denied" the SAA allowed changes in the planned schedule upon notice, Spectre should not have to "assume[] NASA could simply make change after change to the schedule for no reason . . . without employing reasonable effort to comply with the schedule." Pl.'s CMSJ at 12. Plaintiff claims "NASA's delays put Spectre in a horrible position, with the State of Ohio refusing to provide further funds when Spectre could not demonstrate progress" and the government's "suggestion that Spectre can not now justify non-payment because NASA was then concealing" the use of "ancient technology neither designed nor fabricated for Spectre" "is fanciful" and should not be allowed. Pl.'s CMSJ at 14–15.

## B.    Parties' Arguments Regarding the Implied Duty of Good Faith and Fair Dealing of the Space Act Agreement

The government argues NASA did not breach any duty of good faith and fair dealing under the SAA as a matter of law. Gov't's MSJ at 18. The government asserts "because the SAA required Spectre to pay in advance of NASA's efforts, Spectre's refusal to complete the $80,000 payment prior to the start of Milestone 3 meant that Spectre did not have any reasonable expectations to NASA's performance under Milestone 3 and beyond." *Id.* at 19. The government also argues the "benefit of the bargain works both ways, and Spectre's refusal to provide funding for NASA's efforts to be performed in support of later milestones preclude any reliance upon NASA's performance of those later milestones." *Id.* In the government's view, the "fact that Spectre never completed the payment due 'prior to the start of Milestone 3' . . . is enough for the Court to reject Spectre's arguments based on efforts contemplated under the SAA further downstream." Gov't's Reply at 8. The government contends, "[w]ithout a tether to a contractual duty, Spectre's good faith fair and dealing [argument] falls apart." *Id.* at 8–9. In response to Spectre's accusation the government pulled a 'bait-and-switch' by sending Spectre an already-designed wafer instead of designing a new wafer, the government argues Spectre fails to prove such a bait-and-switch: "to prove [a] bait-and-switch, Spectre must prove that NASA made a material misrepresentation in its proposal with an intent to deviate from the proposal" and "Spectre fails to allege, much less prove, any specific misrepresentation by NASA or the requisite intent." *Id.* at 10. The government argues "[w]hile Spectre was in ar[r]ears, its assumption that NASA should have delivered sensor modules using dies from Fabrication Run

1[—]not due until Milestone 6[—]was unreasonable and at odds with the plain language of the SAA," and "it is further irrational for Spectre to turn its unreasonable assumptions into allegations of fraud or bad faith by NASA." *Id.* at 11.

In response, Spectre argues the government breached the implied duty of good faith and fair dealing. While the government "raises the old argument that a breach of the duty of good faith and fair dealing cannot be based on a contract that expressly covers certain matters," Spectre postulates, "[t]he point is that every contract, however[] detailed, has interstitial spaces that must be filled in" by good faith and fair dealing. Pl's CMSJ at 18. Spectre describes multiple instances allegedly evident of the government's breach of good faith and fair dealing: "lying about [the] design and fabrication progress, stealing materials purchased for the Project to use on other projects, using Grant funds to attend professional conferences, working a bait-and-switch and foisting old technology on Spectre while representing it was designed and fabricated specifically for Spectre, refusing to allow Spectre personnel to witness and videotape fabrication steps, refusing to provide CAD files for mask preparation when the SAA clearly called for it, delivering a handful of non-conforming pressure modules and then blaming their failure to perform as specified on Spectre's incompetence." Pl.'s Reply at 9–10. Spectre further argues NASA pulled a bait-and-switch by delivering, without prior explanation, "a handful of sensor modules, only one of which was to specification and which Spectre discovered years later had not been designed and fabricated to Spectre's specifications, but had been designed and fabricated years earlier for some other, unexplained purpose," despite contracting to provide "a total of 36 to 60 functional pressure sensor modules and hundreds of loose dies after the first fabrication run, all of which had been designed and fabricated to Spectre's specifications." *Id.* at 10.

### C.    Parties' Arguments Regarding the Alleged Breach of the Patent License

The government argues it did not breach the Patent License as a matter of law. *See* Gov't's MSJ at 19. The government explains, according to the patent license, the government may unilaterally terminate the license for any of the reasons in Article 19.4—including for failure to submit reports—provided it notifies plaintiff at least 30 days in advance of the intended termination. *Id.* at 20 (citing App'x at 43 (Patent License)). As plaintiff did not submit the required reports, the government contends its "termination of the License plainly complied with the License's terms." *Id.* The government additionally notes Spectre "concedes that NASA gave notice on May 15, 2014 to terminate the License effective June 18, 2014 and identified Spectre's failure to comply with Articles 19.4(a), (b), and (d) as NASA's reasons for the termination." *Id.* (citing Compl. ¶¶ 103, 150). The government further argues "Spectre's alleg[ation] that NASA's May 15, 2014 notice to terminate the License effective June 18, 2014 gave no opportunity to cure," *id.* (citing Compl. ¶¶ 103, 150), "has no merit" because the Patent License only required NASA to provide notice of terminations, *id.* (citing App'x at 43 (Patent License)).

While Spectre agrees "NASA followed the regulatory requirements for granting Spectre's License Application," Spectre argues there "surely exists a genuine issue of material fact as to whether the Project's problems were the result of Spectre's financial condition (which it denies) or NASA's subterfuge." Pl.'s CMSJ at 13. Spectre also admits the Patent License requires Spectre to submit periodic reports, but "suggests under the circumstances, it should be excused

from the Annual Report submittal requirement, which NASA used as a pretext to terminate without notice." *Id.* Despite plaintiff admitting it cannot carry its burden to prove NASA breached the Patent License because "NASA's notice of termination stated unconditionally that it was terminating the Patent License as of a date certain," Spectre maintains "the notice did not allow that Spectre could attempt to show cause why the license should not be terminated." Pl.'s Reply at 13. Spectre further believes, "[r]egardless of what the Patent License itself said, NASA's notice was unconditional and allowed nothing," which Spectre argues was a violation. *Id.*

### D.    Parties' Arguments Regarding the Implied Duty of Good Faith and Fair Dealing of the Patent License

The government argues NASA did not breach any duty of good faith and fair dealing under the Patent License as a matter of law. *See* Gov't's MSJ at 22. The government argues it asserted "a legitimate contract right under the [Patent] License to terminate" and such a termination "'cannot be considered as violative of a duty of good faith and fair dealing.'" *Id.* (quoting *Scott Timber Co. v. United States*, 692 F.3d 1365, 1375 (Fed. Cir. 2012)). The government further argues "NASA in no way prevented Spectre from submitting its periodic reports required by the License," which resulted in a legitimate reason for NASA to terminate the Patent License. *Id.* at 23. The government also asserts "Spectre must prove by clear and convincing evidence that NASA lacked a rational basis for terminating the License," but argues Spectre "offers no proof to support its 'suggest[ion]' that under the circumstances, it should be excused from" the periodic reporting requirement." *Id.* (quoting Pl.'s CMSJ at 13). The government also argues Spectre did not "prove that NASA acted with an improper motive" in terminating the license, so Spectre "failed again to carry its 'heavy burden of proof' to overcome the presumption that public officials act conscientiously in the discharge of their duties in terminating the license." Gov't's Reply at 15.

In response, plaintiff argues "[w]hile in ordinary situations patent holder[s] may have no relationship with the licensee, here Spectre and NASA were bound as collaborators in the Grant Project and parties to the Space Act Agreement," and "as such, reporting progress to NASA would have been a pointless exercise because it would provide NASA with no more information than it already had." Pl.'s Reply at 13. In plaintiff's view "while [the lack of reports] may have given NASA a pretextual reason for terminating the License Agreement, it did not give NASA a good-faith or rational reason for doing so." *Id.* Specifically, Spectre argues termination of the Patent License "was pretextual and in bad faith because the reason Spectre could not successfully reduce to practice within three years was NASA's delay, its refusal to transfer the CAD files for fabrication masks and packaging information, and its refusal to perform further under the SAA." *Id.* Spectre further argues "NASA's bad faith is especially egregious now that it is known that through discovery NASA pulled a bait-and-switch, and that its real motivation for terminating Spectre was because of threats from Meggit[—another patent licensee of NASA—]not to enter into a multi-hundred thousand dollar Space Act Agreement with NASA unless NASA terminated Spectre." *Id.* at 13–14.

### III.    Applicable Law

As an initial matter, despite the parties disagreeing on the applicable law throughout the briefing, the parties agreed on the law when asked at oral argument. *See* 3 April 2025 OA Tr. ("Tr.") at 5:19–6:13 (detailing party agreement on the standard for summary judgment); 6:14–7:12 (detailing party agreement on the standard for breach of contract); 128:7–129:2 (detailing the standard for breach of the implied duty of good faith and fair dealing). As such, the Court details the applicable law for summary judgment, breach of contract, and breach of the implied duty of good faith and fair dealing below.

### A.    Summary Judgment Standard

The Court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A court shall not grant summary judgment if "the dispute about a material fact is 'genuine.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is considered genuine if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* "In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor." *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) (citing *Anderson*, 477 U.S. at 255). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Contract interpretation is a matter of law and thus is amenable to decision on summary judgment." *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); *see, e.g.*, *NVT Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("The interpretation of a contract . . . is a question of law"); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998) (discussing the same proposition).

The party seeking summary judgment bears the burden of establishing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When the moving party has met this burden, the burden shifts to the non-movant who must present sufficient evidence to show a dispute over a material fact allowing a reasonable factfinder to rule in its favor. *Anderson*, 477 U.S. at 256–57. The evidence does not need to be admissible, but mere denials, conclusory statements, or evidence not significantly probative will not defeat summary judgment. *Celotex*, 477 U.S. at 322–24.

### B.    Breach of Contract

To establish a breach of contract claim, plaintiff must show a valid contract between parties, an obligation or duty arising from the contract, breach of that duty, and damages caused by that breach. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). A court must consider the contract as a whole and interpret it as to harmonize and give reasonable meaning to all its parts. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978)) ("'[P]rovisions of a contract must be so construed as to effectuate its spirit and purpose . . . an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it

useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.'"). If a contract's "provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them." *McAbee*, 97 F.3d at 1435 (cleaned up). "To permit otherwise would cast 'a long shadow of uncertainty over all transactions' and contracts." *Id.* (quoting *Trident Ctr. v. Connecticut Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988)). "The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face." *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) (citing *SCM Corp. v. United States*, 675 F.2d 280, 284 (Ct. Cl. 1982)).

### C.    Breach of the Implied Duty of Good Faith and Fair Dealing

"Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)). "A party breaches the contract when it fails to abide by this implied duty, which includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)); *see also* Restatement (Second) of Contracts § 205 cmt. d (stating potential breaches of the implied duty of good faith and fair dealing include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance").

"Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010). A "bait-and-switch" consists of two steps: (1) "the government enters into a contract that awards a significant benefit in exchange for consideration;" and (2) "the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract." *Id.*

## IV.    Analysis of Whether NASA Breached the Space Act Agreement

The Court analyzes whether NASA breached the SAA by examining: (1) whether NASA was required to perform work past Milestone 2 based on the payments Spectre completed; (2) whether the timelines for work in the SAA could be changed; (3) when the SAA required delivery; and (4) whether NASA completed Milestones 1 and 2 of the SAA.

### A.    Whether Spectre's Non-Payment Prevented NASA from Performing Work Past Milestone 2 Under the SAA

Spectre contrives an assortment of grievances in an effort to distract the Court from NASA's basic right to receive funding in advance for any work under the SAA. The government argues despite the many grievances Spectre asserts, NASA did not breach the SAA as a matter of law because Spectre failed to complete the Milestone payments as required, which prevented NASA from further performance under the SAA. Gov't's MSJ at 13. The government argues

the SAA "explicitly and repeatedly required Spectre to pay in advance of NASA's efforts under the SAA" because according to the SAA, "'[p]ayment must be made by [Spectre] in advance of initiation of NASA's efforts . . . . NASA will not provide services or incur costs beyond the available funding amount.'" *Id.* at 14 (quoting App'x at 6 (SAA Article 6)).

The government further argues "Spectre can no longer avoid the fact that it failed to pay the Milestone payment as required by the SAA" because there "is no longer any disagreement on the facts"—under the SAA, "Spectre was required to pay NASA at least the initial $100,000 payment and the first $80,000 milestone payment for a total of $180,000 'prior to the start of Milestone No. 3,'" and "Spectre never paid the remaining $15,000 out of the first $80,000 milestone payment." *Id.* at 13–14 (citations omitted). In the government's view, "[s]atisfaction of the $80,000 milestone payment was . . . a condition precedent to NASA starting to work on Milestone 3." *Id.* at 14 (citing Restatement (Second) Contracts § 225(1)). The government concludes "NASA's inability to complete Milestones 3–6 under the SAA faithfully adhered to the terms of the SAA." *Id.* at 15.

Despite admitting "the payment provisions [of the SAA] cannot be gainsaid," Pl.'s CMSJ at 12, Spectre argues the "SAA in plain language states that each Milestone begin with the complet[ion] of the activities for a previous Milestone, which presumably had been paid for in advance," Pl.'s Reply at 8. Spectre asserts "NASA's full performance of the SAA contemplated that NASA would actually be performing the work upon which those payments had been made before seeking additional payment." Pl.'s CMSJ at 9 (citing Decl. of Jack Keller ¶ 4, ECF No. 162-6). Spectre, therefore, asserts it "completely agrees with the government's statement . . . that 'in essence' Spectre is asking the Court to find that the SAA required payment after the completion of Milestone 2 rather than 'as its explicit language states,' prior to the start of Milestone 3 because that is a distinction without a difference: Milestone 3 starts with the completion of Milestone 2." Pl.'s Reply at 9. Spectre admits it "is well aware of the contractual requirement that NASA be paid in advance, but that does not mean NASA did not have to earn its fees." *Id.* at 4. In Spectre's view, "[t]he [g]overnment further argues—somewhat disingenuously—that Spectre cannot force NASA to 'earn' its contract payments as 'predicate' for future payments because NASA must be paid in advance" is not correct because "Spectre did not argue that NASA had to prove it had performed work before it could be paid for that work[;] it argued [instead] that NASA had to prove it had performed the work for which Spectre had already paid before qualifying for another pre-payment." *Id.*

In interpreting the contract, the court begins with the contract's plain language, *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citations omitted), and gives unambiguous contract terms their plain and ordinary meaning, *Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1373 (Fed. Cir. 2001) (citations omitted). Article 5 of the SAA entitled "Financial Obligations" provides for Spectre's payment obligations:

> 1. Partner *agrees to reimburse* NASA a total estimated cost of $428,335.00 for NASA to carry out is responsibilities under this agreement. . . . Payment must be made by Partner *in advance* of initiation of NASA's efforts.

Spectre Corp. agrees to pay NASA GRC $100,000 *prior to initiation of work* under this agreement, and as follows:

$80,000.00 prior to the start of Milestone No. 3 and
$80,000.00 prior to the start of Milestone No. 8 and
$168,335.00 prior to the start of Milestone No. 11.

*Advance payments shall be scheduled to ensure that funds are resident with NASA before Federal obligations are incurred in support of this agreement.*
. . . .
3.   NASA *will not provide services or incur costs beyond the available funding amount*.   Although NASA has made a good faith effort to accurately estimate its costs, it is understood that NASA provides no assurance that the proposed effort under this Agreement will be accomplished for the above estimated amount. Should the effort cost more than the estimate, Partner will be advised by NASA as soon as possible.   Partner shall pay all costs incurred and have the option of canceling the remaining effort, or providing additional funding in order to continue the proposed effort under the revised estimate.   Should this Agreement be terminated, or the effort completed at a cost less than the agreed-to estimated cost, NASA shall account for any unspent funds within One (1) year after completion of all effort under this Agreement, and promptly thereafter, return any unspent funds to Partner.

4.   Notwithstanding any other provision of this Agreement, *all activities under or pursuant to this Agreement are subject to the availability of funds*, and no provision of this Agreement shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, Title 31 U.S.C. § 1341.

App'x at 6–7 (SAA Article 5) (emphasis added).

As an initial matter, Article 5 does not state NASA needs to "earn its fees," as suggested by Spectre.  *See* Pl.'s Reply at 4 ("Spectre is well aware of the contractual requirement that NASA be paid in advance, but that does not mean NASA did not have to earn its fees.").  In fact, Spectre confirmed at oral argument it was required to make all payments under the SAA "in advance of NASA's efforts."  *See* Tr. at 73:10–14 ("[THE COURT:]  All payments were to be made by Spectre to NASA under the Space Act Agreement, 'in advance of NASA's efforts.' [PLAINTIFF:]  That's correct.").  Additionally, when pressed at oral argument on whether "anything in the Space Act Agreement . . . requires the [g]overnment to have proven it has earned its fees prior to the deliverable in Milestone 6," plaintiff admitted "[n]o, there's nothing that requires it to prove it."  *See* Tr. at 84:19–85:9.  Spectre further admitted at oral argument it had to pay the $80,000 *prior to* the start of Milestone 3 for NASA to begin work on Milestone 3 and beyond.  *See* Tr. at 81:11–14 ("THE COURT:  Under the contract, the $80,000 had to be paid by Milestone 4 in order for NASA to start working on Milestone 3.  [PLAINTIFF:]  Yes.").  As such, under the plain language of Article 5—which controls Spectre's payment responsibilities—Spectre was required to make all payments to NASA prior to any work being performed and NASA was not required to "earn its fees."  *See McAbee*, 97 F.3d at 1434–35

(cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

Notably, Spectre does not dispute the amount it was supposed to pay NASA under the SAA. *See* Tr. at 73:15–74:9 (detailing Spectre admitting, based on the payment schedule in Article 5, it was to pay NASA $100,000 up front and $80,000 prior to the start of Milestone 3). While plaintiff agrees Article 5 provides for the payments Spectre was to make under the SAA, Spectre maintains NASA had to "earn its fees." *See* Pl.'s CMSJ at 8–9. As discussed *supra*, the Court already determined the SAA's plain language placed no "earn its fees" requirement on NASA; rather, the SAA only required Spectre to pay NASA a total of $180,000 *prior to the start of* Milestone 3. *See* App'x at 6 ($80,000.00 prior to the start of Milestone No. 3"); *see McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

As the SAA required Spectre to pay NASA a total of $180,000 prior to the start of Milestone 3, the Court now analyzes whether Spectre's actual payments prevented NASA from further performance under the SAA. At oral argument, Spectre agreed it had only paid NASA $165,000 under the SAA, and agreed it was $15,000 short of what was due prior to the start of Milestone 3. *See* Tr. at 74:7–17 ("[THE COURT:] So the total [paid] under the Space Act Agreement was [$]165,000? [PLAINTIFF:] Right. . . . THE COURT: So just to confirm, Spectre was $15,000 short of what was due prior to the start of Milestone 3? [PLAINTIFF:] That's correct."). The government argues because Spectre failed to complete the payments prior to the start of Milestone 3, NASA was prevented from further performance under the SAA. *See* Gov't's MSJ at 22–23. As established *supra*, the SAA required Spectre to pay in advance for all of NASA's initiatives, and NASA therefore could not have continued work under the SAA without receiving payment. When pressed on this fact at oral argument, Spectre capitulated "under the four corners" of the SAA it had to complete the payments for NASA to begin work under Milestone 3. *See* Tr. at 79:3–17 ("THE COURT: But at the end of the day, under the four corners of the contract, . . . Spectre had to complete the payments in order to begin Milestone 3? [PLAINTIFF:] Yes, it did."). As such, under the plain language of the SAA, NASA was not required to complete any work beyond Milestone 2 because Spectre failed to make the payments as required. *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

Having established the plain language of the SAA required Spectre to make all payments prior to NASA performing work and Spectre did not complete the required payments under the SAA, the Court analyzes whether Spectre had a contractual reason to not complete its payment obligations. The fact Spectre never completed the $80,000 payment due "prior to the start of Milestone 3" as required by the SAA, is no longer in dispute—Spectre paid NASA $165,000 under the SAA. *Compare Spectre Corp. v. United States*, 132 Fed. Cl. 626, 628 (2017) (denying the government's Motion to Dismiss for lack of payment because "the parties disagreed as to the amount Spectre paid NASA under the Space Act Agreement"); *with* Tr. at 74:7–9 ("[THE COURT:] So the total [paid] under the Space Act Agreement was [$]165,000? [PLAINTIFF:] Right."). Spectre, as discussed *supra*, was therefore $15,000 short on the pre-Milestone 3 payment. *See* Tr. at 74:14–17. When pressed at oral argument on why Spectre did not pay the additional $15,000 owed under the SAA, Spectre explained it became "frustrated" with NASA's

lack of deliverables but recognized there was nothing in the SAA to excuse payment.  *See* Tr. at 85:10–22 ("THE COURT:  [I]n an email from Spectre[—]this was Spectre Exhibit 4944.  Spectre said, 'We will not pay one dime more till 90 percent of deliverables in sensors on-site training of one-run scrap are completed.'  [PLAINTIFF:]  Oh yes.  My client got a little excited when he wrote that . . . . [THE COURT:] And fully utilized the shift key for capitalization, too . . . . Is there any basis in the Space Act Agreement to support that requirement?  [PLAINTIFF:] No.").  Spectre also explained it "didn't have the money," despite having received "upwards of $900,000 from the State of Ohio," because Spectre had to pay for other operating costs.  *See* Tr. at 76:8–77:7, 90:20–24 ("[THE COURT:]  [I]s there any reason why Spectre did not simply complete paying the $15,000 before Milestone 3?  [PLAINTIFF:]  It didn't have the money . . . . They had opened a factory in Ohio . . . . They were operating and . . . they had started with totally new employees who they trained to build these completed sensor units.  And the State of Ohio had recognized that part of the funds could be used for training new employees because . . . that was part of the purpose of the grant, . . . to have new employees doing things, new things that would increase the tax base.").  Spectre's choice to use the money from the State of Ohio for general operating costs, however, was its choice—and did not excuse Spectre from making the required payments under the SAA because the money was meant to go to NASA.  *See* Tr. at 78:6–19.  In fact, NASA originally wanted the full amount, $428,335.00, for work under the SAA up front, but agreed to a payment plan to benefit Spectre.  *See* Tr. at 89:20–90:5 ("THE COURT:  Under the original terms of the contract, Spectre was required to pay the entire estimate cost, but then NASA agreed to . . . payment steps?  [PLAINTIFF:]  NASA started off wanting all the money up front.  That's true . . . . THE COURT:  NASA agreed to a payment schedule that would benefit [Spectre]?  [PLAINTIFF:]  Well, right.").  Thus, Spectre failed to provide a contractual reason for not completing its payment obligations required by Article 5 of the SAA—it only had an out-of-contract reason for not completing the payments.

Spectre acknowledged it was not a breach of the SAA for NASA to require payment prior to the start of Milestone 3.  *See* Tr. at 86:23–87:2 ("[THE COURT:]  Was NASA's requirement for payment a breach of the Space Act Agreement?  [PLAINTIFF:]  No.").  As Spectre failed to complete the required payments under the SAA, and Spectre was to pre-pay for all of NASA's work, *see* App'x at 6 ("Payment must be made by [Spectre] in advance of initiation of NASA's efforts."), the Court agrees with the government NASA was not required to perform any work past Milestone 2 under the plain language of the SAA.  *See* Tr. 83:22–84:14 ("[THE COURT:] NASA did not move on to Milestone 3 or beyond because Spectre did not meet the Space Act Agreement payment obligations."  [GOVERNMENT:]  That's correct.  And just the funds were exhausted. . . . [THE COURT:]  And just to confirm, the [g]overnment believes that NASA was excused from contemplating anything past Milestone 2 because of Spectre's incomplete payment?  [GOVERNMENT:]  That's correct.  Because the SAA Article 5 says. 'The payments shall be made in advance of any NASA efforts."); *see also McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

### B.    Whether Delays in the Timeline Were Permissible Under the SAA

The parties dispute whether the change in the SAA's timeline was allowed under the SAA.  Spectre argues NASA should have abided by the SAA's timelines as detailed in Article 4

entitled "Schedules and Milestones." *See* Pl.'s Reply at 5–6. Despite Spectre recognizing the "SAA allow[ed] NASA to change the planned schedule upon notice," Spectre argues the language allowing for a change in the schedule "must be interpreted to allow NASA reasonable extensions for legitimate reasons." *Id.* at 9. Spectre agrees NASA giving notice "its MEMS laboratory would be closed for a month in late 2012 and that no deep reactive ion etching could be performed, and that it would be closed during the [g]overnment shutdown which began on October 1, 2013 . . . . were reasonable, unavoidable delays . . . . But NASA never gave notice or explanation as to delays that caused the project to lag far behind the Grant Schedule." *Id.* The government argues the SAA "provided only estimated time frames for the milestones." Gov't's MSJ at 17 (citing App'x at 5 (SAA Schedules and Milestones)). The government emphasizes the SAA "explicitly stated that any schedule or milestone therein was based upon the parties' 'understanding of the projected availability of NASA personnel, facilities and equipment.'" *Id.* (citing App'x at 7 (SAA Priority of Use)). The government argues the SAA "required only that Spectre 'shall be given reasonable notice of that change.'" *Id.* (citing App'x at 7 (SAA Priority of Use)). In the government's view, "any estimated schedule was voided once Spectre failed to pay according to the SAA." *Id.* (citing App'x at 6–7 (SAA Financial Obligations)) ("Notwithstanding any other provision of this Agreement, all activities under or pursuant to this Agreement are subject to the availability of funds."). The government argues "Spectre's difficulties starting in August 2012 in paying the first $80,000 milestone payment, even in installments, undermine any contention it has that NASA breached the SAA by any delay." *Id.*

In interpreting the contract, the Court begins with the contract's plain language, *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citations omitted), and gives unambiguous contract terms their plain and ordinary meaning, *Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1373 (Fed. Cir. 2001) (citations omitted). When interpreting a contract, the document must be considered as a whole and interpreted to harmonize and give reasonable meaning to all its parts. *See McAbee*, 97 F.3d at 1434–35. Article 4 of the SAA entitled "Schedule and Milestones" provides for the original timeline contemplated by the parties:

ARTICLE 4. <u>SCHEDULE AND MILESTONES</u>
The planned major milestones for the activities defined in the "Responsibilities" clause are as follows:

|  |  |
|---|---|
| 1. NASA completes Pressure Sensing Element Design | end of Month 3 from signing |
| 2. NASA completes Wafer Fabrication | end of Month 3 from signing |
| 3. NASA completes Sensing Element Test | end of Month 5 from signing |
| 4. NASA completes Header Fabrication and Assembly | end of Month 5 from signing |

| | |
|---|---|
| 5. NASA completes Pressure Sensing Module Functional Test | end of Month 6 from signing |
| 6. NASA delivers Fabrication Run 1 Sensors to Spectre | end of Month 6 from signing |

App'x at 5 (SAA Schedule and Milestones). Article 6 of the SAA entitled "Priority of Use" allows for changes to the schedule and explains "[a]ny schedule or milestone in this Agreement is *estimated* based upon the Parties' current understanding of the projected availability of NASA personnel, facilities and equipment" and "[i]n the event that NASA's projected availability changes, [Spectre] shall be given reasonable notice of that change, so that the schedule and milestones *may be adjusted* accordingly." App'x at 7 (SAA Priority of Use) (emphasis added). Article 5, as discussed *supra*, further provides "[n]otwithstanding any other provision of this Agreement, all activities under or pursuant to this Agreement are subject to the availability of funds." App'x at 6–7 (SAA Financial Obligations).

As the Court must consider the document as a whole and interpret to harmonize and give reasonable meaning to all its parts, *see McAbee*, 97 F.3d at 1434–35, the Court must look at all the various Articles relied upon by the parties to determine whether the SAA's timeline was rigid. Under the plain language of the Articles, while the SAA provided a timeline for work under the SAA, the timeline was based upon NASA's availability to perform the work. *See supra*. Additionally, the SAA allowed for changes in the schedule upon notice of the change. *See supra*. The work to be performed under the timeline, however, is subject to the availability of funds because, as discussed *supra*, Spectre was required to pre-pay for all work performed by NASA. Spectre even admitted the Schedule and Milestones in Article 5 were only estimates and not strict requirements in the contract. *See* Tr. at 73:3–8 ("[THE COURT:] [A]t the end of the day, Article [4], Schedule and Milestones, these were just estimates. It was not strict requirements in the contract. [PLAINTIFF:] That's correct."). As such, under the plain language of the SAA, the timeline was an estimate—subject to change—and not a strict requirement in the contract. *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

Having determined the timeline for work to be performed under the SAA was subject to change with proper notice, the Court analyzes whether the delays constituted breach of contract. To begin, Spectre noted at oral argument there were delays from the beginning and "the initial delays were in negotiating and putting these contracts in place after the grant was awarded." Tr. at 13:6–13. Before even signing the SAA, Spectre was aware delaying payment would result in NASA's performance also being delayed. *See* Tr. at 45:18–46:7 ("[GOVERNMENT:] [I]n the submissions to that were provided to the Court, [prior to oral argument,] . . . Spectre knew back before the Space Act [Agreement] was signed . . . [according to] an email dated October 17th[, 2011] . . . Spectre [was] pleading with the State of Ohio. They had said to the state of Ohio that, per our conversation with NASA, any delays in NASA funding can dramatically delay the Space Act Agreement and delivery of prototypes due to scheduling conflicts in their laboratories . . . . It shows that Spectre knew . . . if they delayed their payments, they would delay NASA's activities."). Spectre, therefore, knew a delay in payment would result in a delay of work under the SAA, and as such, Spectre should have known failing to complete the payment before

Milestone 3, *see supra* Section IV.A, would delay the original SAA timeline.  This is further supported by the email records Spectre's counsel submitted to the Court prior to oral argument,[2] demonstrating Spectre's continuous delay of payments to NASA—ultimately delaying NASA's performance.  *See* Tr. at 116:24–120:8 ("[THE COURT:] These were emails that [Spectre's Counsel] attached on 31 March [to the Court].  So there was an email . . . from Robert Kistemaker, October 1st, 2012.  The subject there is, 'Important considerations on Spectre/NASA Collaboration Agreement.'  And it begins, 'Today is October 1st, 2012.  NASA GRC still has not received any monies from your firm under the Space Act Agreement to proceed with ongoing work.' . . . So that email seems to contemplate and explicitly says that [NASA] asked for the entire amount of $80,000.  And then there's further emails as we get into 2013, where it seems like between October of 2012 and then January of 2013 where things were paid . . . So did NASA get paid the $80,000?  [GOVERNMENT:]  NASA never got paid the full [$]80,000.  THE COURT:  So October 1st, 2012, NASA is demanding money due and says amount [due] by October 5th, 2012, did NASA get that?  [GOVERNMENT:]  NASA got, on October 10th, 2012, $30,000. . . . [THE COURT:]  'So per the below email traffic, as a courtesy on August 20th, 2012, NASA GRC offered a stretch-out payment plan to accommodate Spectre.  We now rescind that offer and ask for the entire amount of $80,000 by Friday, October 5th, 2012.' . . . 'We will have to stop all work if no payment received.'  [GOVERNMENT:]  [U]pon receiving only [$]30,000, NASA went ahead and continued. . . . THE COURT:  So then if we fast forward to January 4th, 2013, another email says, 'Our NASA Space Agreement is about to run out of funds.  As accounting records show there's less than $1,500 on account for Dr. Okojie labor.'  So there is a formal notice.  But Spectre . . . was in debt. . . . [GOVERNMENT:]  [A]s of that date [Specter was] still owing [$]50,000.  And then on . . . January 7th, [Spectre] pa[id] only $20,000 towards that [$]50,000.").

   While the government was not able to point the Court to a specific email informing Spectre it was deficient on the $80,000 payment due prior to the start of Milestone 3, the government relied on Spectre's submissions to demonstrate NASA was continually seeking payment from Spectre to continue work under the SAA.  *See* Tr. at 122:7–13 ("[GOVERNMENT:]  Other than just email[s] like this one, just requesting continued payment from Spectre, I don't believe there was a formal letter to inform Spectre that they are deficient.").  Despite NASA continually seeking payment from Spectre—and Spectre having received the funds from the State of Ohio to pay NASA—Spectre never completed the required payment and contributed to delay.  *See* Tr. at 96:17–23 ("[GOVERNMENT:]  [T]he evidence, especially the audit from the State of Ohio, shows that Spectre actually received . . . pre-reimbursement from the State of Ohio that . . . Spectre should have paid NASA, but they didn't.").  As such, there was no breach from NASA's delayed performance because under the plain language of the SAA NASA was not required to perform any work without the appropriate funds—meaning NASA could not continue to perform without payment from Spectre.  *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning."); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

---

[2] While these email submissions were not included in summary judgment briefing, they were part of the record and included Bates Numbers.  Additionally, the email submissions were extensively discussed and quoted at oral argument without objection by the parties, and the parties were intimately familiar with the email submissions.

### C.    When Delivery Was Contemplated Under the SAA

The parties initially disputed whether the Space Act Agreement reached a point where delivery by NASA was required. *Compare* Pl.'s CMSJ at 6 ("Although [NASA] continued to report fabrication of the first wafer, testing, and shipment to its subcontractor for packaging and testing, NASA failed to make delivery within promised durations and no reason was ever given."), *with* Gov't's MSJ at 16 ("NASA's first obligation to deliver to Spectre any sensors and necessary data to reproduce the sensors in Milestone 6 never came due."). At oral argument, however, the parties agreed delivery was not contemplated or required by the SAA until Milestone 6. *See* Tr. at 60:5–19 ("[THE COURT:]  The delivery was contemplated at Milestone 6. [PLAINTIFF:]  Right."); 72:19–22 ("[THE COURT:]  NASA actually had no delivery obligation until Milestone 6?  [GOVERNMENT:]  Exactly."). The SAA also supports delivery was not required under the SAA until Milestone 6:  under Article 3 of the SAA entitled "Responsibilities," the first time "delivery" is contemplated is under the responsibilities for Milestone 6. *See* App'x at 4 (SAA Responsibilities) ("NASA will deliver a minimum of 36 die mounted onto headers that meet minimum specifications . . . NASA will deliver a report to Spectre . . . NASA will provide all data . . . NASA will share data . . . ."). Likewise, Article 4 of the SAA provides "NASA delivers Fabrication Run 1 Sensors to Spectre" in Milestone 6. *See* App'x at 5 (SAA Schedule and Milestones). Based on the parties' agreement and the plain language of the SAA, the Court determines the SAA did not require delivery by NASA until Milestone 6. *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

Despite delivery not being required until Milestone 6, and NASA only being required to complete Milestones 1 and 2 because of Spectre's payments, *see supra* Section IV.A, NASA made several out of contract deliveries to accommodate Spectre. To begin, "Spectre had expressed to NASA that they needed package[d] sensors early to test their system[s]" and were "demanding a lot of packaged sensors . . . even though those efforts were not due yet under the Space Act Agreement." Tr. at 64:7–16. Spectre, despite acknowledging it was not "expecting delivery," was "hoping for" and demanding delivery from NASA. *See* Tr. at 60:21–61:3 ("[THE COURT:]  So at this point, assuming that we're in Milestone 1 and Milestone 2, your client would not expect anything.  [PLAINTIFF:]  Well, [it] wasn't expecting delivery, but [it] was hoping for delivery because the goal [of the SAA] was to get . . . things designed, get them made, and get them out into the market because this was a commercialization project, and time is money."). Spectre even made requests for premature delivery from NASA. *See* Tr. at 68:16–69:25 ("[THE COURT:]  [W]as there an additional request from Spectre? . . . [PLAINTIFF:] [Y]es.  Because of the delays, they did ask. . . . [THE COURT:]  Did Spectre ask for [completed sensor modules] prematurely?  [PLAINTIFF:]  They asked if there was any way that NASA could provide something for them to use for testing of the electric boards that they were developing because they didn't have anything to test the boards with."). Spectre further clarified it understood delivery was not yet required under the SAA but had become frustrated with NASA and requested delivery. *See* Tr. at 79:1–12 ("[PLAINTIFF:]  Well, part of the problem . . . was that my client was getting very frustrated with the fact that NASA was not [making progress] and [Spectre] know[s] that . . . the delivery hadn't come up.").

In an attempt to accommodate Spectre's early delivery demands, NASA had to expend funds from the money Spectre already paid. *See* Tr. at 70:12–19 ("THE COURT: [H]ow much money did the [g]overnment spend in order to early accommodate? . . . [GOVERNMENT:] [B]ased on the package[d] sensors that were provided . . . . That would have been $15,000."). While NASA acknowledged this cost was not much compared to the money Spectre already paid, the funds were depleting because Spectre was not paying as they were required under the SAA. *See* Tr. at 70:20–71:2 ("[THE COURT:] But that's not much compared to how much had been paid by Spectre, right? [GOVERNMENT:] It was not much, . . . [but] at that point, [NASA] was really just scraping by with a few thousand dollars here and there. And that was what made [the] work very difficult because [NASA] did not have sufficient funding to continue [the] work."). Despite depleting funds, NASA delivered sensors to be tested and packaged, *see* Tr. at 114:9–12 ("[THE COURT:] NASA also did send sensors to Sienna Technologies for testing and packaging, correct? [GOVERNMENT:] Yes."), and gave Spectre pre-fabricated dies to allow Spectre to begin testing, *see* Tr. at 69:23–70:1 ("[PLAINTIFF:] [NASA] gave [Spectre] an old[—]and this was known to be an old sensor that was mounted and packaged. And [NASA] gave that to [Spectre] to use for testing to develop the electric boards."). NASA believes, "in retrospect," making early deliveries at the request of Spectre was a "bad idea" but was just "trying to be cooperative." *See* Tr. at 71:17–22; *see also* Tr. at 68:10–16 ("[GOVERNMENT:] [These deliveries were] an additional requirement or request from Spectre. So . . . those sensors that were delivered early were not strictly part of the milestones. It was just an effort that was made to accommodate Spectre.").

Despite NASA making early, out-of-contract deliveries and exhausting the SAA's funds at Spectre's request, Spectre maintains the deliveries violated the SAA because they were not "fabricated and designed" for Spectre. *See* Tr. at 111:2–14 ("THE COURT: What language of the Space Act Agreement would [sending pre-fabricated dies] violate? [PLAINTIFF:] The language that says, 'For the money it's being paid, NASA will design and fabricate dies to Spectre's specifications,' which [means] sending them something that was not designed to and fabricated to their specification . . . breaches the agreement."). The government, however, argues the SAA does not prohibit NASA from "using old dies for those extra packaged sensors sent to Spectre." *See* Tr. at 110:13–18 ("[GOVERNMENT:] But for the . . . additional package[d] sensors that were sent prior to Milestone 4 and Milestone 6, there's nothing in the SAA to prohibit NASA from using old dies for those extra packaged sensors sent to Spectre because those were not required by the SAA."). In fact, at oral argument, Spectre agreed it was not an issue for NASA to make out-of-contract deliveries and use old dies to accommodate Spectre's requests. *See* Tr. at 113:24–114:8 ("[THE COURT:] If NASA was not required to deliver anything until Milestone 6, how is it problematic that NASA delivered something prior to being required? [PLAINTIFF:] It's not problematic."). Delivery was not required prior to Milestone 6, and Spectre did not complete payments to allow work progression past Milestone 2, *see supra* Section IV.A, so the out-of-contract deliveries made by NASA are not a breach of the SAA. *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning."); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

## D.    Whether NASA Completed Milestones 1 and 2 of the SAA

Having established the SAA only progressed to the end of Milestone 2, *see supra* Section IV.A, the Court next analyzes what NASA was required to complete during Milestones 1 and 2 under the SAA and examines whether NASA completed those Milestones.

### 1.    SAA Requirements Under Milestones 1 and 2

Milestone 1 of the SAA was "Pressure Sensing Element Design," and required NASA to "define the necessary wafer processing steps to yield desired performance in each of three pressure ranges stated" in the SAA (*i.e.*, 0–150 psi, 0–500 psi, and 0–1000 psi). App'x at 3 (SAA Responsibilities). The parties do not dispute what was required under Milestone 1 and confirmed at oral argument Milestone 1 was the "design phase," which required NASA to "define the necessary wafer processing steps." *See* Tr. at 40:5–7 ("[PLAINTIFF:]  Milestone 1 is completion of the sensor design work."); 44:10–14 ("[THE COURT:]  Milestone 1 . . . was [the] design paragraph. . . . [GOVERNMENT:]  Yes."). Accordingly, Milestone 1 required NASA to complete the design for the wafer and define the necessary wafer processing steps. *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

Milestone 2 was for "Wafer Fabrication" wherein:

> NASA will fabricate one or more boron-doped silicon carbide wafers as necessary to meet delivery of a minimum of 12 and maximum of 20 finished pressure sensing modules for each of three pressure ranges. NASA will record process steps, masks, and other data as necessary to allow Spectre or one of its vendors to reproduce results. The fabrication will be performed in the clean room of the Silicon Carbide Micro-fabrication Laboratory at NASA GRC. Each die will be identified with the wafer number and die address (row/column) of its origin. All wafer material, used or unused, whether functioning or non-functioning die or sensing elements, will become property of Spectre Corporation.

App'x at 3–4 (SAA Responsibilities). The parties do not dispute Milestone 2 was the "fabrication" step and when NASA would "complete wafer fabrication." *See* Tr. at 61:24–62:2 ("[GOVERNMENT:]  The fabrication, yes. So that's Milestone 2."); Pl.'s Reply at 5 ("Under Milestones 1 and 2, NASA was to have completed wafer design and the first fabrication run."); *see also* Tr. at 56:21–58:21. Accordingly, under Milestone 2, NASA was to complete the wafer fabrication and "record process steps, masks, and other data as necessary to allow Spectre or one of its vendors to reproduce results." *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

### 2.    Whether NASA Completed Milestone 1

Having determined Milestone 1 was the "design" phase and Milestone 2 was a "fabrication" phase, *see supra*, the Court now analyzes whether there is a genuine dispute of material fact as to whether NASA completed both Milestones. The government relies upon the traveler for Wafer Number DH0851-15 as evidence to demonstrate NASA's completion of

Milestone 1 and 2. *See* Gov't's MSJ at 9 (citing App'x at 65–71 (Wafer Traveler)) ("NASA completed Milestones 1 and 2 demonstrated by at least a traveler for Wafer Number DH0852-15."). According to the government, a traveler is a "set of documents that follow the wafer as it works its way through a semiconductor lab or semiconductor production facility." Tr. at 46:23–47:3; *see* Tr. at 47:4–8 ("[GOVERNMENT:] [The government] analogiz[es] making a wafer or a wafer fabrication with baking a pizza. . . . [I]n that analogy, the wafer traveler would be sort of the kitchen ticket that sort of just slides across when it moves to different stations."). The government argues the traveler "identified the mask set number NASA_01162013 designed pursuant to Milestone 1 as well as the associated wafer processing steps defined for the same design," and claimed the "traveler also recorded the details of fabrication processing steps performed by NASA on at least Wafer Number DH0852-15 pursuant to Milestone 2 from March 2013 through August 2013." Gov't's MSJ at 9 (citations omitted). Despite the government presenting the traveler as evidence of Milestone 1 and 2 being completed by NASA, Spectre argues the traveler is not evidence NASA completed Milestones 1 and 2 because the government did not present any facts to establish the DH08512-15 wafer was "actually designed and fabricated" for Spectre—in Spectre's view, this means "NASA failed to complete Milestones 1 and 2 under the SAA." Pl.'s CMSJ at 13–14; *see id.* (citing Votypka Decl. ¶¶ 25–33) ("As set forth [in plaintiff's Cross-Motion for Summary Judgment] and in the Declaration of Jeff Votypka, NASA has presented no facts to establish that wafer DH0852-15 was actually designed and fabricated for Spectre and much evidence to suggest it was not."). Specifically, Spectre asserts "the DH08512-15 wafer was not purchased for the project" and argues "there is nothing in the [DH08512-15 wafer] traveler to tie the fabrication of this wafer to Spectre's project." Pl.'s Reply at 7. At oral argument, Spectre clarified its "primary argument . . . [was] that Milestones 1 and 2 were not met because [Spectre] disagree[d] with the evidence [the government] submitted," and claimed "Mr. Votypka's after-the-fact investigation [] support[s] the wafer [] was not fabricated [or] design[ed] for Spectre." Tr. at 92:3–20.

The government argues the traveler demonstrates "[NASA] completed Milestone 1 . . . in January 2013." *See* Tr. at 46:11–20. Specifically, the government explains the traveler has a "Pressure Sensor Mask Number [of] NASA_01162013" showing the date of January 2013 as "the absolute conclusion of Milestone 1." *See* Tr. at 103:10–15, 107:19–21. When asked whether NASA completed Milestone 1, Spectre argued it "do[es]n't think so" because "there is no evidence that this wafer or any of the other wafers were actually fabricated for or designed for Spectre." Tr. at 47:18–25; *see* Tr. at 49:21–50:3 ("[THE COURT:] [The government] pointed to a specific piece of evidence . . . . And why does that not satisfy Milestone 1? [PLAINTIFF:] Because there's no proof . . . that [the] work actually was done to design those dies to my client's specifications"). When pressed on whether there was any additional evidence to refute NASA completed Milestone 1, Spectre responded: "[T]here's no evidence, other than Dr. Okojie, who repeatedly lied, there's no evidence that he actually designed [DH0852-15 wafer] for [Spectre]." Tr. at 56:16–19. Spectre, however, was neither able to identify any evidence in Dr. Okojie's deposition supporting the DH0852-15 wafer was not made for Spectre or undermining the traveler, *see* Tr. at 99:10–15 ("THE COURT: So could [Spectre], . . . point to . . . anything in the deposition from Dr. Okojie that points to the DH0852-15 wafer not being made for Spectre or undermines anything related to the traveler? [PLAINTIFF:] No."), nor could it provide evidence Dr. Okojie was lying about the DH0852-15 wafer being designed and fabricated for Spectre, *see* Tr. at 100:2–5 ("[THE COURT:] But what shows that [Dr. Okojie] was lying? I'm

asking . . . for the evidence. [Spectre's Counsel] said it was in the deposition. [PLAINTIFF:] [Spectre] never said that [Dr. Okojie] . . . lied about DH[0852-15].""). In fact, Spectre only referenced deposition testimony from Dr. Okojie which supported the wafer was designed and fabricated for Spectre. *See* Tr. at 100:5–16 (reading portions of Dr. Okojie's deposition testimony into the record) ("[PLAINTIFF:] 'Was it your belief that the material you sent to me belongs to Spectre? 'Yes.['] 'And that was because you made these dies for Spectre. 'ANSWER: It is part of the Space Act Agreement.'"). Instead of providing a citation to the deposition testimony, Spectre tells the Court "it's reasonable to infer" Dr. Okojie lied about designing and fabricating the DH0852-15 wafer for Spectre. *See* Tr. at 100:17–21. Despite Spectre having eight hours to question Dr. Okojie at his deposition and press him about the traveler to determine whether he was lying, Spectre chose not to do so. *See* Tr. at 51:6–12 ("[GOVERNMENT:] Although [Spectre's counsel] did have the opportunity to depose Dr. Okojie during deposition . . . and [the government] went back and looked and search for the times it mentioned DH. It was barely two pages. And so [Spectre's counsel] made a clear choice to not ask Dr. Okojie further about the DH."); 92:16–24 ("[PLAINTIFF:] I did not go back . . . I deposed Dr. Okojie for eight hours. I had a lot of things to cover that day.).

Strikingly, the deposition testimony referenced by Spectre actually supports NASA completed Milestone 1 and the DH0852-15 wafer was designed and fabricated for Spectre. *See* Tr. at 99:15–22 ("[PLAINTIFF:] [Dr. Okojie] told . . . [plaintiff's counsel] that it was made for Spectre. . . . [Dr. Okojie] says that he sent it to [plaintiff's counsel] because it belonged to Spectre, . . . it was made for Spectre."). Other evidence also supports the traveler and DH0852-15 was completed for Spectre according to Milestone 1. The traveler contained the mask number indicating the design was completed at the latest in January 2013, *see supra*, and there was a contemporaneous email from Dr. Okojie to Spectre dated 22 December 2012 indicating the design required under Milestone was met by providing a document "listing the process steps"— which Spectre confirmed it received. *See* Tr. at 55:21–56:13 ("[PLAINTIFF:] [T]here was no documentation sent over and no communication sent over that said, now I really have designed something for you. THE COURT: Well, the [g]overnment also mentioned a contemporaneous email related to design having been met. . . . [GOVERNMENT:] [I]t was December 22nd, . . . of 2012. It didn't explicitly sa[y] that the design was done, but it was transferring . . . a document listing the process steps . . . as a piece of information for Spectre to learn how to do this process. [PLAINTIFF:] Yes. They sent us the process steps."). Even in Spectre's briefs, it does not explain how Dr. Okojie's deposition supported Spectre's position; instead, Spectre instructed the Court to "take the time to read Exhibit 12 to the Okojie Deposition . . . and consider the shocking lack of contract performance by NASA." Pl.'s CMSJ at 13. Spectre could point to no evidence to support NASA did not complete Milestone 1—it only asserted Dr. Okojie was "lying." *See* Tr. at 107:11–14 ("THE COURT: Does Spectre have any other evidence that NASA did not complete Milestones 1 and 2. [PLAINTIFF:] No."). As Spectre was unable to present any evidence to refute the traveler or present any evidence demonstrating NASA did not complete Milestone 1, the Court determines there is no genuine dispute of material fact over whether NASA completed Milestone 1 under the SAA. *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (affirming lower court's judgment granting summary judgment) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)) ("[T]he burden is *not* on the movant to *produce evidence* showing the *absence* of a genuine issue of material fact. 'Instead, as we have explained, the burden on the moving party may be discharged by

"showing"—that is, pointing out to the . . . Court—that there is an absence of evidence to support the nonmoving party's case.'"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining a genuine issue of material fact exists if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party.").

### 3.    Whether NASA Completed Milestone 2

The government further relies on the traveler as evidence NASA completed Milestone 2. *See* Tr. at 57:8–9 ("[GOVERNMENT:] Again, [the government] point[s] to the DH wafer traveler."). The government argues the traveler is evidence NASA satisfied Milestone 2 because the traveler includes "process steps, masks, and other data" and demonstrates the "completion of the wafer fabrication being the last etching step on August 16, 2013." Tr. at 71:8–13; App'x at 3–4 (SAA Responsibilities). When asked at oral argument whether NASA completed Milestone 2, Spectre explained its position was the wafer NASA produced did not actually meet the requirements of the SAA—but provided no evidence rebutting the traveler "record[ed] process steps, masks, and other data as necessary to allow Spectre or one of its vendors to reproduce results" as required by Milestone 2. *See* Tr. at 57:18–58:23; App'x at 3–4 (SAA Responsibilities). In other words, while Spectre argued the wafer must be made for them and satisfy the specifications set forth in the SAA, it provided no evidence (nor did it point to anywhere in the record) showing the wafer did not satisfy those specifications—instead, Spectre attempted to discount the traveler by arguing it is a "debacle of a production" that "took place over many months." *See* Tr. at 57:22–24. Despite acknowledging the traveler was a true summary of the actual wafer produced, *see* Tr. at 57:18–22 ("THE COURT: [I]s [] the [traveler] that were looking at is not a true summary of an actual wafer that was produced? [PLAINTIFF:] Oh, no."), Spectre maintained the traveler and DH0852-15 wafer did not match the lithography given to Spectre a year before the date of the traveler. *See* Tr. at 58:8–23 ("THE COURT: And so Plaintiff's position is that the wafer that was produced did not actually meet the requirement? [PLAINTIFF:] Because, Your Honor, in July of 2012, Dr. Okojie said, 'I have completed the lithography.' Meaning, the geometric design of the three wafers of all three pressure ranges. And he produced a document to us, which if you look at it, shows four different dies on it to be, you know, replicated onto one wafer."). Spectre instead relies on the observations of one of its engineers, Mr. Votypka, to support the traveler was not for something designed and fabricated for Spectre under Milestone 2. *See* Tr. at 101:13–16 ("[THE COURT:] [Spectre] also point[s] to Mr. Votypka's observations related to his assessment of Milestones 1 and 2; is that correct? [PLAINTIFF:] Yes."). Specifically, Spectre argues Mr. Votypka's observations demonstrated the DH0852-15 wafer "was not the same design that [NASA] had shown [Spectre] in July of 2012 when [Dr. Okojie] said, 'The lithography is complete for your dies,'" and the traveler is a "document that had four different dies on it." Tr. at 101:24–102:10. In response, the government argues Dr. Okojie never said the lithography was complete and asserts "in his deposition [he] said that he did not know anything about it." Tr. at 102:12–17. The government further argues Mr. Votypka's comparison of a design from 2012 to the 2013 design present in the traveler does not mean the DH08512-15 wafer was not designed and fabricated for Spectre because "what was presented in 2012 . . . has no bearing to what was done in 2013, and certainly does not disprove or somehow prove that NASA did not make th[e] DH wafer for Spectre." Tr. at 102:18–103:2. Spectre also relies upon Mr. Votypka's declaration to support its position the wafer DH was not fabricated and designed as part of the SAA, but instead was designed as part

of NASA's ongoing research and development projects. *See* Tr. at 92:12–20 ("THE COURT: Related to those milestones being met, is there any evidence separate from Mr. Votypka's after-the-fact investigation to support that the wafer DH was not fabricated [or] design[ed] for Spectre. [PLAINTIFF]: Your Honor, I believe that if you had Dr. Okojie in the witness stand and I was cross-examining him, you would find, as the trier of fact that the wafer was part of his ongoing research and development project."). Spectre, however, was once again unable to provide any evidence the DH0852-15 wafer was being used for any other purposes. *See* Tr. at 107:5–10 ("THE COURT: Is there any evidence that the dies from Wafer DH0852-15 were used for any other purpose? [PLAINTIFF:] I'm not aware of any evidence. Except, well, they were . . . sent to me in the mail.").

While NASA proffered evidence of it recording steps, masks, and other data to allow Spectre to reproduce the fabrication as required by the SAA, *see* App'x at 3–4 (SAA Responsibilities), Spectre failed to present evidence supporting its claim NASA did not complete the requirements set forth in the SAA regarding Milestone 2. *See* Tr. at 107:11–14 ("THE COURT: Does Spectre have any other evidence that NASA did not complete Milestones 1 and 2? [PLAINTIFF:] No."); Tr. at 107:5–10 ("THE COURT: Is there any evidence that the dies from Wafer DH0852-15 were used for any other purpose? [PLAINTIFF:] I'm not aware of any evidence."). As Spectre was unable to present any evidence to refute the traveler or present any evidence demonstrating NASA did not complete Milestone 2, the Court determines there is no genuine dispute of material fact over whether NASA completed Milestone 2 under the SAA. Given NASA completed Milestone 2 under the SAA and did not need to complete any other Milestones because of Spectre's failure to pay the remaining $15,000 required prior to Milestone 3, the Court finds NASA did not breach the SAA as a matter of law. *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (affirming lower court's judgment granting summary judgment) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)) ("[T]he burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact. 'Instead, as we have explained, the burden on the moving party may be discharged by "showing"—that is, pointing out to the . . . Court—that there is an absence of evidence to support the nonmoving party's case.'"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining a genuine issue of material fact exists if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party").

## V.    Analysis of Whether NASA Breached the Implied Duty of Good Faith and Fair Dealing Under the Space Act Agreement

Having determined NASA did not breach the SAA, *see supra* Section IV, the Court next analyzes whether NASA breached the implied duty of good faith and fair dealing. During oral argument Spectre confirmed to prove a breach of the implied duty of good faith and fair dealing a specific promise in the contract must be undermined. *See* Tr. at 128:9–15 ("[THE COURT:] [T]he Federal Circuit in Dobyns notes . . . that 'while there's not a requirement of a violation of an express provision, a specific promise must be undermined for the implied duty of good faith and fair dealing to be violated,' correct? [PLAINTIFF:] Yes."). Spectre further confirmed the Court cannot rely on parol evidence to add or otherwise modify the terms of the contract. *See* Tr. at 128:17–23 ("[THE COURT:] [T]he Court also cannot rely on parol evidence to add or otherwise modify the terms of the written agreement in instances where the written agreement

has been adopted by the parties as an expression of final understanding, right? [PLAINTIFF:] Yes."). The Court, therefore, analyzes whether NASA undermined a "specific promise" or obligation in violation of the implied duty of good faith and fair dealing. *See Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated."); *see also Metcalf Const. Co, Inc. v. Unites States*, 742 F.3d 984, 992 (Fed. Cir. 2014) (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract").

When asked by the Court to identify a specific promise in the SAA that was undermined, all Spectre could offer as evidence was NASA violating the SAA's reasonable efforts clause. *See* Tr. at 129:3–130:17 ("[THE COURT:] So what is the specific promise of the Space Act Agreement looking at the document that has been violated? [PLAINTIFF:] Well, . . . all of NASA's Space Act Agreements . . . have this reasonable efforts clause in them. . . . [THE COURT:] [W]hat specifically, can you point to me, the provision, the reasonable efforts clause, . . . what paragraph is that in[?] [PLAINTIFF:] It's the preface. . . . It's on page 3, . . . Right before NASA's responsibilities. . . . [THE COURT:] So that's the specific promise that was broken? [PLAINTIFF:] Right."). After identifying the reasonable efforts clause as the specific promise NASA violated, Spectre explained it is not "a reasonable effort to take your customer's money and substitute something . . . instead of doing what you're supposed to do." Tr. at 130:14–17. Spectre, however, agreed because it never completed the payment prior to Milestone 3, NASA no longer had to make reasonable efforts beyond Milestones 1 and 2. *See* Tr. at 130:18–131:23 ("THE COURT: But [Spectre] agree[s] . . . that [p]laintiff's payment due by the end of Milestone 2, prior to the beginning of Milestone 3, meant that NASA no longer had any reasonable efforts to make, other than Milestones 1 and 2? [PLAINTIFF:] Right.").

Spectre argues NASA breached the implied duty of good faith and fair dealing due to NASA's non-completion of Milestones 1 and 2 and insufficient production of sensors under the SAA. *See* Tr. at 130:23–131:5 ("[PLAINTIFF:] If [NASA] actually completed Milestones 1 and 2, which they claimed they completed . . . the face is that [NASA] was nowhere near . . . 36 sensors in three different pressure ranges made [as required under the SAA]."). This argument fails for two reasons: (1) the Court already determined NASA completed Milestones 1 and 2, *see supra* Section IV.D.2–D.3; and (2) NASA was not required to complete any further Milestones because of Spectre's non-payment prior to the start of Milestone 3, *see supra* Section IV.A. As such, NASA could not have breached an implied duty of good faith and fair dealing through the reasonable expectation clause because there was no reasonable expectation for NASA to perform past Milestone 2. *See Dobyns*, 915 F.3d at 739 ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated."); *see also Metcalf Const.*, 742 F.3d at 992 (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract").

Spectre also claims a bait-and-switch occurred when NASA "pawn[ed] off old sensors designed and fabricated for somebody else for some other purpose" and "pawned off ancient technology as something that is good enough." Pl.'s CMSJ at 2, 6–7, 18. When asked at oral argument about the bait-and-switch, Spectre confessed NASA only needed to complete

Milestones 1 and 2 and was not required to deliver any sensors until Milestone 6. *See* Tr. at 131:16–132:15 ("[THE COURT:] [Spectre] argue[s] . . . that there was a bait and switch, where NASA contracted to provide a total of 36 of 60 functional pressure sensor modules and hundreds of loose dies after the first fabrication run, all of which had been designed and fabricated to Spectre's specification. But under the Space Act Agreement, none of that delivery was required until Milestone 6, so how could anything have been due before then? [PLAINTIFF:] Well, Milestone 1 and 2 were due.") As delivery was not required prior to Milestone 6, *see supra* Section IV.C., NASA's non-delivery of functional pressure sensor modules and loose dies was not a breach of the implied duty of good faith and fair dealing. *See Dobyns*, 915 F.3d at 739 ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated."); *see also Metcalf Const.*, 742 F.3d at 992 (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract").

Finally, Spectre argues NASA breached the implied duty of good faith and fair dealing by performing research and development under the SAA because "[d]espite the precatory language, the purpose of the SAA was not to develop prototypes as a feasibility study, it was to pay NASA to jumpstart the . . . Project by designing and fabricating the first two waves of SiC pressure modules." Pl.'s CMSJ at 10–11. Spectre claims while the SAA in the introductory section explains the purpose of the contract "is to produce a sufficient number of sensor modules to determine 'suitability for the commercial market,' . . . all parties (except perhaps Dr. Okojie) knew that the technology was ready to be commercialized." *Id.* at 11. Specifically, Spectre argued the "State of Ohio made clear that the purpose of all this funding, these grants, was not for research and development, it had to be for commercialization because they wanted to build the tax base" and "the Space Act Agreement was not for NASA to do research and development" because "the invention was already made" and NASA "was just specifying the pressure [Spectre] want[ed]." Tr. at 19:7–25. NASA agreed the primary purpose of the SAA was to "produce a sufficient quantity of silicon carbide-based pressure sensor modules fabricated according to the NASA patents," but argued the context shows "this was still in development." Tr. at 20:17–21:4. The government argues while the SAA "was to produce a sufficient quantity to demonstrate certain properties and certain feasibility," "it does not mean it was a production environment . . . especially with the combination of different things [NASA] was trying." Tr. at 21:6–15. In the government's view, the SAA was "essentially a research and development" contract because "it was very much a[t a] prototyping stage." *See* Tr. at 21:16–22:3 ("THE COURT: So the [g]overnment's position is that the Space Act Agreement was a research and development agreement? [GOVERNMENT:] It was, yes."). The Court agrees with the government that while the SAA was for commercialization, the SAA contemplated research and development. To begin, Milestones 1 through 10 of the SAA required testing, packaging, and further testing of the modules in Run 1 and then in Run 2 NASA would improve upon the first run— demonstrating research and development was contemplated to improve upon Run 1 in Run 2. *See* Tr. at 27:10–18 ("[GOVERNMENT:] [T]he discussion of the different milestones did show that it was a research and development. Because Milestone 1 through 10 was to do one run, one sort of complete spin of this process of design through testing, through packaging, and then further testing of the modules. And then only in Run 2, [NASA] would improve and apply all the learnings [NASA] had. So that does show that it was a research [and] development.").

The SAA itself also contemplates research and development in "Article 2. Purpose," stating, "the first fabrication run will provide Spectre with sufficient sensor modules to verify final packaging arrangement, to conduct necessary validation testing, and to conduct initial field trials with potential customers." App'x at 1–2 (SAA Purpose). As explained at oral argument, verifying final packaging arrangements is important to this type of technology because the packaging is what protects the sensors and allows them to function. *See* Tr. at 28:9–19 ("THE COURT: Can [the government] provide a little bit more context, what does the language mean, 'verify final packaging arrangement,' and why is that important for this type of technology? [GOVERNMENT:] Well, packaging, generally speaking, in sensors are a humungous challenge. Especially in this case, we're talking about high-temperature application. So the packaging that surrounds the chip, surrounds the semiconductor die, needs to survive that and not cause the degradation, in the performance of the die itself."). This packaging was contemplated as part of Spectre's responsibilities, *see* App'x at 2 (SAA Responsibilities) ("Spectre will take all necessary steps to put the sensing modules provided by NASA into housing with any necessary condition electronics, boards, fixtures, etc. to present as prototype components for evaluation by Spectre customers."), as well as third parties (Sienna Technologies, Inc.) contemplated in Milestone 4, *see* App'x at 4 (SAA Responsibilities) ("The header fabrication and attachment of sensors to the headers will be performed by Sienna Technologies, Inc, Woodinville, WA at NASA's expense under NASA's direction."). Under the SAA, NASA would subcontract the packaging to Sienna, and this is part of the larger multi-step process under the SAA of creating a commercially viable product. *See* Tr. at 31:24–32:5 ("[THE COURT:] [T]he functionality of the agreement, it's that money would come into NASA for the purposes of perfecting commercialization. As part of NASA's work, NASA would actually have money going out to other parties in order to create the full packaging of the system? [GOVERNMENT:] Yes."); Tr. at 38:5–10 ("THE COURT: So these modules, in order to put together a module, there's a multi-step process that involves creating dies, shipping them across the country, having a production run by Sienna, having them ship items back, things like that? [GOVERNMENT:] Yes."). As clarified by the government based on the record, the work performed by Sienna under the SAA would not have been considered a "production run" because the cost was far greater than commercialization and involved many technical steps to create viable, finished packaging for later commercialization demonstrates research and development regarding packaging was required. *See* Tr. at 38:10–39:8 ("[GOVERNMENT:] Just one clarification about what Sienna would do. I do not believe that they consider that a production run because just looking at the cost, they were quoting $50,000 for . . . 36. That is an incredibly high number for production. And I believe that they were doing that as a prototype. . . . [b]ecause the unit cost of $1,500 per package would be uneconomical in the industry. And so I believe that also shows that this was a research and development process because the cost that was quoted was Sienna was not feasible commercially. THE COURT: . . . [I]n order to produce 30 modules, Sienna quoted NASA a charge of around $50,000. [The government's] point is that that high-cost shows that Sienna is also having do a lot of technical steps. [GOVERNMENT:] Yes . . . And that unit cost of $1,500 each shows that it was more of a one-off instead of a true production."). As the SAA contemplated many aspects of research and development, particularly regarding packaging, and many factors needed to be determined prior to commercialization, NASA's research and development occurring during early milestones of the SAA was not a breach of the implied duty of good faith and fair dealing. *See Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing]

- 26 -

to be violated."); *see also Metcalf Const. Co, Inc. v. Unites States*, 742 F.3d 984, 992 (Fed. Cir. 2014) (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract").

## VI.    Analysis of Whether NASA Breached the Patent License

Despite claiming in in its brief "Spectre Cannot Carry Its Burden to Prove that NASA Breached the Patent License," Spectre explained during oral argument its brief included further "typos." *See* Tr. at 124:6–15 ("THE COURT: So [Spectre's] Roman Numeral III, the heading is "Spectre cannot carry its burden to prove that NASA breached the patent license." Is that, like, a rhetorical statement or something, or is it a typo? [PLAINTIFF:] You know, I think I copied this . . . so that was another typo. . . . I was using the heading that the [g]overnment had used and replying to them."); *see also* Tr. at 91:10–92:2 (detailing a similar typo where Spectre stated "NASA did not breach the Space Act Agreement as a matter of law"). The Patent License was the second agreement executed between Spectre and NASA. *See* App'x at 18–47 (Patent License). Spectre paid NASA $50,000 for the royalty-bearing, exclusive license to practice NASA's silicon-carbide sensor patents. *See id.* NASA granted Spectre the Patent License pursuant to the authority in the Bayh-Dole Act, 35 U.S.C. § 200, *et seq.*, and its implementing regulations at 37 C.F.R. § 404. *See* App'x at 21 (Patent License). The Bayh-Dole Act allows NASA to grant patent licenses to "promote the utilization of inventions arising from federally supported research or development." 35 U.S.C. § 200. Patent licenses, however, can be granted under the Bayh-Dole Act "only if the applicant has supplied the Federal agency with a satisfactory plan for development or marketing of the invention, or both, and with information about the applicant's capability to fulfill the plan." 37 C.F.R. § 404.5(a)(1). Consistent with the Bayh-Dole Act, the Patent License requires a licensee to achieve practical application of the patents in accordance with a specific schedule and file periodic reports on its progress. *See* App'x at 27, 30–32 (Patent License). Spectre agrees "NASA followed the regulatory requirements for granting Spectre's License Application," Pl.'s CMSJ at 13, but argues NASA's termination of the Patent License was in violation of the Bayh-Dole Act because NASA's "notice did not allow . . . Spectre . . . to show cause why the license should not be terminated," Pl.'s Reply at 13. The government, however, argues the Patent License required Spectre to, at a minimum, submit periodic reports and failure to submit such reports was a valid basis under the Patent License for NASA to terminate. *See* Gov't's MSJ at 6–8, 21. As the only issue is whether NASA properly terminated the Patent License, the Court next analyzes whether NASA's termination of the Patent License was a breach by first determining what was required under the contract for NASA to terminate and then examining whether NASA's termination was proper.

Under Article VIII of the Patent License entitled "Reports," Spectre, as the licensee, was required to "submit to [NASA] written reports within thirty (30) calendar days of the end of every ACCOUNTING PERIOD whether or not royalties are due." App'x at 30 (Patent License) (emphasis in original). Article VII Section 8.2 of the Patent License also detailed what needed to be included in Spectre's reports: "a narrative description of the steps taken or being taken to reduce the LICENSED INVENTION to practice" and "a narrative description of the steps taken or being taken to create a market demand for the LICENSED INVENTION, to commercialize the LICENSED INVENTION, and to meet market demand for the LICENSED INVENTION."

*See* App'x at 30–31 (Patent License) (emphasis in original).  The plain language of the Patent License therefore required Spectre to submit periodic reports, even if no royalties to NASA were due.  *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

Article XIX of the Patent License entitled "Termination or Modification," specifically Section 19.4, detailed when NASA could terminate the License.  *See* App'x at 42 (Patent License).  Section 19 allows "terminat[ion] by LICENSOR, in whole or in part, if:

> (a) LICENSOR determines that the LICENSEE has failed or will fail to meet milestone in accordance with the schedule set forth in the APPENDIX to this AGREEMENT, . . . or to achieve or maintain PRACTICAL APPLICATION of the LICENSED INVENTION as provided by ARTICLE V.
>
> (b) LICENSOR determines that LICENSEE has failed or will fail to reduce to practice or substantially manufacture the LICENSED INVENTION in the United States as provided by Section 6.1.
> . . .
> (d) LICENSEE fails to pay royalties or submit reports as provided by ARTICLE VII and VIII."

App'x at 42 (Patent License) (emphasis in original).  Section 19.7 further provides "[b]efore LICENSOR unilaterally . . . terminates this AGREEMENT for any cause, LICENSOR will deliver to LICENSEE . . . a written notice stating LICENSOR's intention to . . . terminate the AGREEMENT and the reasons therefor.  LICENSEE . . . will be allowed thirty (30) calendar days after . . . such notice of intention to . . . terminate the AGREEMENT to remedy any BREACH or the AGREEMENT or show cause why the AGREEMENT should not be unilaterally . . . terminated."  App'x at 43 (Patent License) (emphasis in original).  Under the plain language of the Patent License, NASA was therefore allowed to unilaterally terminate the license agreement if Spectre failed to submit reports and NASA was only required to provide written notice and allow 30 days for Spectre to remedy the breach or show cause why the Patent License should not be terminated.  *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

Having determined the Patent License allowed for unilateral termination by NASA if Spectre did not comply with the Patent License's requirements—including submitting periodical reports—the Court now examines whether NASA's termination of the Patent License was proper.  Spectre "suggests that under the circumstances, it should be excused from the Annual Report submittal requirement." Pl.'s CMSJ at 13.  When discussing the termination of the Patent License in its brief, Spectre retorts, "Have we not already addressed this?" only then to proceed and admit "Yes, Spectre did not make the Annual Reports," and Spectre not complying with the reporting requirements "was a foul without harm because there was nothing to report other than NASA was delaying the Project." Pl.'s CMSJ at 16.  Under the express terms of the Patent License, Spectre was required to submit reports, and not submitting reports was grounds for unilateral termination by NASA.  *See* App'x at 30–31 (Patent License) (requiring reports even if

no royalties were due), *id.* at 42 (Patent License) (permitting licensor to terminate if "LICENSEE fails to . . . submit reports as provided by ARTICLE VII and VIII.") (emphasis in original). At oral argument, Spectre agreed NASA could terminate the Patent License for any reason listed in Section 19.4 and confessed it did not provide the reports to NASA as required by the Patent License. *See* Tr. at 124:16–125:2 ("[THE COURT:] [D]oesn't the license allow NASA to terminate the [P]atent [L]icense for any reason listed in article 19.4. [PLAINTIFF:] Yes. . . . [THE COURT:] [A]t a minimum, 19.4D, which required annual reports, I think [p]laintiff admits that Spectre did not give periodic reports? [PLAINTIFF:] That's right."). As such, Spectre's failure to submit reports was not "a foul without harm" because it was an express requirement under the Patent License and allowed NASA to unilaterally terminate the license in whole pursuant to Section 19.4(d) of the Patent License. *See McAbee*, 97 F.3d at 1434–35 (cleaned up) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning."); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

Spectre further argues NASA did not give Spectre the "right to cure or an opportunity to contest [an] appeal, it simply informed Spectre that its license would be terminated effective in 30 days." Pl.'s CMSJ at 16. The Patent License, however, only required NASA to provide written notice of termination explaining the reason NASA was terminating and allow Spectre the opportunity to cure or show cause. *See* App'x at 42–43 (Patent License). At oral argument, Spectre acknowledged NASA provided notice it was terminating the Patent License on 15 May 2014 but averred the notice was invalid because "it's arguable that there's a notice and opportunity to cure." Tr. at 124:20–23. But Spectre *was* given an opportunity to respond to the notice of termination. *See* Tr. at 126:18–127:5 ("THE COURT: Did NASA give Spectre the opportunity to cure . . . and to respond? [GOVERNMENT:] They did because the termination was not going to be effective until more than 30 days . . . after the notice. And that was the opportunity for Spectre to cure if they wished to. They . . . knew they had 30 days, in fact, a little bit over 30 days, and they did nothing during that period."). Spectre itself admitted "it do[esn]'t think that [it] responded effectively" in response to NASA's notice regarding the Patent License's termination. *See* Tr. at 127:16–128:6. When pressed on why it did not cure or show cause, Spectre said it believed it was "too little, too late." *See* Tr. at 125:14–24 ("THE COURT: Did Spectre request the 30-day opportunity to cure or show cause, or how did Spectre respond? [PLAINTIFF:] Well, at that point, Your Honor. NASA had already announced it was not going to do any more work under the Space Act Agreement, so it was a little futile. I think, if I recall, my client went out and hired a sol[o] practitioner to try to argue some things on [Spectre's] behalf, but it was too little, too late, and it didn't go anywhere."). As NASA provided Spectre notice of termination and allowed thirty days for Spectre to cure or show cause according to the terms of the Patent License—and Spectre failed to effectively respond, cure, or show cause—the termination of the Patent License was not a breach. *See McAbee*, 97 F.3d at 1434–35 (cleaned up ) ("If the contract's provisions are clear and unambiguous, they must be given their plain and ordinary meaning."); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

## VII.    Analysis of Whether NASA Breached the Implied Duty of Good Faith and Fair Dealing Under the Patent License

Spectre argues NASA breached the implied duty of good faith and fair dealing by terminating the Patent License in "bad faith." Pl.'s CMSJ at 2. Specifically, Spectre purports "NASA terminated the Patent License on the ground that it appeared Spectre would not be able to reduce the inventions to practice within the contractually required 36 months and that Spectre had failed to make progress reports which were specious grounds raised in breach of NASA's duty of good faith and fair dealing because NASA was the cause of the delay and of Spectre's inability to reduce the patent to practice." Pl.'s Reply at 3. As discussed *supra*, to determine if there was a breach of the implied duty of good faith and fair leading, the Court must determine whether NASA undermined a "specific promise" or obligation in violation of the implied duty of good faith and fair dealing. *See Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated."); *see also Metcalf Const. Co, Inc. v. Unites States*, 742 F.3d 984, 992 (Fed. Cir. 2014) (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract"). NASA did nothing to prevent Spectre from submitting the periodic reports required under the Patent License, and Spectre even admits it did not submit the reports even though it was required. *See supra* Section VI. Additionally, NASA followed Patent License's requirements for unilaterally terminating by providing written notice of termination to Spectre. *See supra* Section VI. NASA's termination of the Patent License, therefore, was not "wrongful" as Spectre claims, but was according to the terms of the Patent License. *See supra* Section VI. As it was Spectre, not NASA, who caused the delay in the Project and NASA followed the requirements of the Patent License, Spectre's claims do not support NASA breached of the implied duty of good faith and fair dealing under the Patent License. *See Dobyns*, 915 F.3d at 739 ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated."); *see also Metcalf Const.*, 742 F.3d at 992 (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract").

Spectre further argues "NASA's bad faith is especially egregious now that it is known that through discovery that NASA pulled a bait-and-switch, and that its real motivation for terminating Spectre was because of threats from Meggitt not to enter into a multi-hundred thousand dollar Space Act Agreement with NASA unless NASA terminated Spectre." Pl.'s Reply at 13–14. Spectre claims "[d]iscovery showed that Meggitt—which had licensed that same patents from NASA in 2007[—]had been protesting and putting pressure on NASA ever since discovering Spectre's Patent License in the Spring of 2012." *Id.* at 14. Despite claiming discovery revealed pressure on NASA from Meggitt, Spectre did not include the emails supporting these claims in its summary judgment briefing, nor did it provide any citations to the record; rather, Spectre sent copies of the emails to the Court prior to oral argument in response to the Court's questions regarding items mentioned in the summary judgment briefing. The government did not object but argues the emails between Meggitt and NASA were not part of evidence to be considered for oral argument. *See* Tr. at 137:9–11 ("[GOVERNMENT:] Frankly, we believe [Spectre's reliance on the Meggitt emails] is grounds for waiver as well because [Spectre] should have submitted th[em] with [its] opening brief."). Although the Meggitt emails were not included with Spectre's opening brief to support its claim NASA breached the implied duty of good faith and fair dealing under the Patent License, the emails were extensively discussed at oral argument, read into the record, and the parties did not object

to discussing the emails. The Court therefore analyzes whether the emails support Spectre's allegations of bad faith based upon the discussion at the oral argument.

To begin, the government explains Meggitt was a licensee of some of the same NASA patents as Spectre. *See* Tr. at 133:23–134:7 ("[THE COURT:] Who is Meggitt, and how are the related to the Space Act Agreement? [GOVERNMENT:] So my understanding is that Meggitt is . . . or probably at least was a licensee of at least some . . . of the same patents that Spectre licensed, and they were basically adjacent licensees. So Meggitt has certain fields of use, and Spectre has other fields of use."). Despite admitting there are emails from Meggitt to NASA in which Meggitt was "complaining" about NASA's Patent License with Spectre in 2012, the government revealed NASA ignored Meggitt's threats for at least two years until it terminated the Patent License in 2014. *See* Tr. at 134:8–25 ("THE COURT: Did Meggitt pressure NASA into terminating with Spectre? [GOVERNMENT:] Well, . . . I see that as just one licensee complaining against another. Just like, . . . for example, somebody living in a dorm saying that they have a loud neighbor. It doesn't mean . . . it was a pressure. THE COURT: But Meggitt specifically said that the work that NASA was doing with Spectre was in violation of the contract that Meggitt had? [GOVERNMENT:] I believe there were some threats, perhaps, if at that. But again, that is just a complaint, and I believe that was first launched in 2012. And . . . NASA did nothing about it for at least two years."). Spectre agreed with this timeline at oral argument and confirmed NASA did nothing for two years. *See* Tr. at 136:5–23 ("THE COURT: [Spectre] agree[s] . . . with what [the government] said about the timeline, is that Meggitt told NASA that the patent license with Spectre is in conflict back in 2012 . . . but NASA didn't do anything until, at the earliest, at some point in 2014? [PLAINTIFF:] Well, they . . . hoped that Meggitt would just forget about it and go away."). The government also confirmed it informed Meggitt the licenses between Meggitt and Spectre did not overlap and were not in conflict based on NASA's due diligence prior to entering the licenses. *See* Tr. at 136:24–137:8 ("[THE COURT:] [I]s there any communication and evidence where NASA said to Meggitt that the agreement with Spectre was of no concern with Meggitt or disagrees with Meggitt's representations in the the[] emails? [GOVERNMENT:] Yes. . . . There are letters like that. THE COURT: But they're not in evidence now? [GOVERNMENT:] Yes. Because we were not aware [] because [Spectre] did not submit [the Meggitt emails] with [its] brief."); 138:7–12 ("[THE COURT:] [W]hy did NASA sign a license with Spectre after it had signed an exclusive license with Meggitt? [GOVERNMENT: Because the fields of views were different. And based on NASA's determination there were no overlap[s]."). Even though the correspondences between Meggitt and NASA were not properly part of summary judgment because they were not submitted with Spectre's Cross-Motion for Summary Judgment brief, discussion of the correspondences during oral argument demonstrates Meggitt did not pressure NASA to terminate Spectre's Patent License. *See* Tr. at 134:8–25, 136:5–23. As such, this evidence does not support Spectre's claim NASA breached the implied duty of good faith and fair dealing under the Patent License. *See Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated."); *see also Metcalf Const. Co, Inc. v. Unites States*, 742 F.3d 984, 992 (Fed. Cir. 2014) (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract").

## VIII. Parties' Previous Settlement Discussions

Although not included in the parties' summary judgment briefing, the Court notes at oral argument the parties discussed multiple settlement discussions before this case was filed and during this litigation. Initially, prior to this litigation, NASA offered to repay Spectre the full $215,000 paid under the SAA and Patent License. This was confirmed by the draft Termination Agreement of the SAA and Patent License from 27 March 2014 provided to the Court by plaintiff's counsel before oral argument. The draft Termination agreement noted upon termination NASA would return to Spectre the $165,000 it paid under the SAA and the $50,000 it paid under the Patent License—which Spectre confirmed at oral argument. *See* Tr. at 139:17–140:18 ("[THE COURT:] [C]ertainly, based on the communications that occurred prior to litigation, it looked like NASA had suggested repayment, which was contemplated . . . as part of the end of the Space Act Agreement. . . . [PLAINTIFF:] There were original settlement talks before the agreements were terminated. But my client got back to NASA too late, and NASA said, 'Oh, the deal's off.' And so they were originally agreeing to refund, but [NASA] said, 'Sorry, that's gone.'"). The Court substantively discussed the parties revisiting settlement discussions based on the current record and possible options the parties could explore in attempting to resolve the case. *See* Tr. at 139:17–150:14 (discussing settlement options). The Court subsequently ordered a JSR regarding the parties' settlement discussions. 4 April 2025 Order, ECF No. 168. In the JSR, the parties informed the Court no agreement could be reached. 8 April 2025 JSR at 4, ECF No. 169.

## IX.    Conclusion

For the foregoing reasons, the Court determines NASA did not breach: (1) the SAA, *see supra* Section IV; (2) the implied duty of good faith and fair dealing under the SAA, *see supra* Section V; (3) the Patent License, *see supra* Section VI; or (4) the implied duty of good faith and fair dealing under the Patent License, *see supra* Section VII. The Court therefore **GRANTS** the government's Motion for Summary Judgment, ECF No. 158, and **DENIES** plaintiff's Cross-Motion for Summary Judgment, ECF No. 162. The Clerk's Office is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge